**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

JAMES EVERETTE WORRELL,
            *Defendant-Appellant.*

No. 01-4857

Appeal from the United States District Court
for the Eastern District of North Carolina, at Elizabeth City.
Terrence W. Boyle, Chief District Judge.
(CR-00-11-BO)

Argued: September 25, 2002

Decided: December 17, 2002

Before TRAXLER, Circuit Judge,
HAMILTON, Senior Circuit Judge, and
Claude M. HILTON, Chief United States District Judge
for the Eastern District of Virginia, sitting by designation.

Affirmed by published opinion. Judge Traxler wrote the opinion, in which Senior Judge Hamilton and Chief Judge Hilton joined.

## COUNSEL

**ARGUED:** George Alan DuBois, Assistant Federal Public Defender, Raleigh, North Carolina, for Appellant. Dennis M. Duffy, Assistant United States Attorney, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Thomas P. McNamara, Federal Public Defender, Raleigh,

North Carolina, for Appellant. John Stuart Bruce, United States Attorney, Anne M. Hayes, Assistant United States Attorney, Raleigh, North Carolina, for Appellee.

---

**OPINION**

TRAXLER, Circuit Judge:

James Worrell was convicted by a jury on two counts of mailing threatening communications. *See* 18 U.S.C.A. § 876 (West 2000). He received a prison sentence of 115 months. On appeal, Worrell contends that the district court erroneously excluded expert testimony regarding how his unmedicated mental condition affected his behavior at the time the threatening letters were mailed. Worrell also challenges his sentence, arguing that the district court improperly applied a six-level sentencing enhancement based on its determination that "the offense involved . . . conduct evidencing an intent to carry out" the threats contained in the letters. *U.S. Sentencing Guidelines Manual* (U.S.S.G.) § 2A6.1(b)(1) (2000). We reject these arguments and affirm Worrell's convictions and his sentence.

I.

Worrell was incarcerated for an unrelated crime when he became convinced that Theresa Roberson, his former girlfriend and the mother of two of his children, had become romantically involved with another man. Worrell, who was due to be released from prison in late 2000, admits writing and mailing from prison a series of threatening letters to Theresa. Federal law makes it a crime to "knowingly deposit[ ] in any post office or authorized depository for mail matter, to be sent or delivered by the Postal Service" or to "knowingly cause[ ]" the Postal Service to deliver "any communication with or without a name or designating mark subscribed thereto, addressed to any other person and containing any threat to . . . injure the person of the addressee or of another." 18 U.S.C.A. § 876.

In one of the letters, dated February 28, 2000, Worrell wrote to Theresa that he knew she was "seeing some guy that [she] work[ed]

with" and that he intended to "[p]ut a stop to it." J.A. 445. Worrell warned that "[w]hoever this guy is better be watching his ass [b]ecause I intend to do some harm . . . [a]nd I will be loaded for bear. If you know what I mean." J.A. 445-46. Worrell also boasted that he could have someone hurt the man while Worrell was still incarcerated, but explained that he preferred to "do it [himself]. It'll be a lot more fun that way. . . . [H]e is a dead man if I catch him." J.A. 446-47. Before closing the letter, Worrell switched his attention to Theresa's stepfather, Mike, threatening that "this time I will get Mike. The first time you stopped me. This time you won't." J.A. 446. Theresa testified that she was attracted to a man with whom she worked but denied that they were romantically involved. Theresa also testified that Worrell and Mike had gotten into arguments about Worrell's physically abusive treatment of Theresa. Similarly, Worrell testified that he and Mike never got along and came close to blows but were restrained by other people. This letter was the basis for count one of the indictment.

Shortly after sending the February 28 letter, Worrell began threatening Theresa. In a letter dated March 20, 2000, Worrell opened with an obscenity-laced tirade against Theresa and her mother and closed with the following threat: "No matter what the law says I can always get a gun and no one can stop what I plan on doing with it. Can you guess what I plan on doing? Bang-Bang Bitch. Ha-Ha. How do you like that. . . . [Y]ou have been a very bad girl. So you mu[st] pay with your life." J.A. 451-52. The threats contained in the March 20 letter served as the basis for count two of the indictment.

Worrell's initial strategy was to raise a defense based on his diagnosis of bipolar disorder and intermittent explosive disorder. Prior to trial, Worrell moved for permission to file an untimely notice of an insanity defense under Rule 12.2(a) of the Federal Rules of Criminal Procedure, which the district court granted. Worrell also filed a notice pursuant to Rule 12.2(b) that he intended to present "expert testimony relating to [Worrell's] mental condition bearing on the issue of his guilt" from Dr. George Corvin, a forensic psychiatrist. J.A. 17.

After interviewing Worrell for approximately an hour and reviewing Worrell's mental health records, Dr. Corvin summarized his conclusions in a letter to Worrell's attorney which was proffered to the

district court as reflecting the substance of Dr. Corvin's expected testimony.[1] Dr. Corvin noted that the diagnoses of bipolar affective disorder and intermittent explosive disorder were "well supported by information obtained" during his evaluation of Worrell, and that Worrell "responded well to treatment with mood stabilizing and antipsychotic medications." J.A. 48. However, Dr. Corvin reported that when Worrell is not treated, "he experiences extreme affective instability, mood swings, irritability, grandiosity, impaired judgment, and disorganized thinking." J.A. 48. Observing that the medical staff at the Roanoke City Jail had discontinued Worrell's medication on February 16, 2000, shortly before he sent the first in his series of letters to Theresa, Dr. Corvin opined that "[a]lthough there is no clear indication that Mr. Worrell's psychiatric symptoms . . . around the time of his alleged offense were of sufficient severity to totally negate his ability to understand the nature[,] quality[,] or wrongfulness of his actions, it is quite clear that he was quite impaired psychiatrically during the time in question." J.A. 49. Dr. Corvin concluded that Worrell's "untreated psychiatric illness contributed substantially to the commission of his alleged offenses" and "the fact that he was taken off his medication clearly played a critical role in the gradual psychiatric decompensation that took place in the days leading up to his alleged offenses." J.A. 49. Dr. Corvin's letter did not address Worrell's intent to mail the letters to Theresa.

After receiving Dr. Corvin's summary of his evaluation of Worrell, the government moved *in limine* to exclude any evidence relating to Worrell's mental condition.[2] The government made a two-fold argument based on the federal insanity defense, *see* 18 U.S.C.A. § 17(a)

---

[1] Worrell did not make a formal proffer of Dr. Corvin's proposed testimony either at the pre-trial hearing or at trial.

[2] The government also filed a motion requesting that Worrell be required to submit to a mental examination. The district court granted the motion and referred Worrell to Dr. Mark Brooks, a forensic psychologist. After interviewing Worrell and reviewing his mental health records, Dr. Brooks concluded that "although the defendant may have experienced symptoms of mental disorder at the time of the offenses charged, the defendant possessed the clear intention to threaten the recipient of the letters and the clear intention that the letter was to be delivered to the recipient through the U.S. mail." J.A. 88.

(West 2000), which was enacted through the Insanity Defense Reform Act ("IDRA"), Pub. L. No. 98-473, Title II, § 402(a), 98 Stat. 2057 § 20 (1984). First, the government contended that IDRA absolutely precludes a federal defendant from presenting any evidence relating to defendant's mental condition unless the defendant is pursuing a formal affirmative insanity defense. Second, the government argued that even if IDRA allows a defendant to offer such evidence, it would be for the narrow purpose of negating a specific intent element of a crime, and Dr. Corvin's opinion, as summarized in his letter to defense counsel, did not offer a basis to negate the specific intent required for the offense of mailing a threatening communication under § 876.

Given that Dr. Corvin could not say that Worrell was unable to appreciate the nature and quality or wrongfulness of his criminal acts, counsel for Worrell candidly conceded to the district court that Worrell did not qualify for an insanity defense. However, Worrell still sought to introduce Dr. Corvin's testimony on the basis that mailing a threatening communication in violation of § 876 is a specific intent crime, and that Dr. Corvin's testimony would negate the specific intent that the government was required to prove for a conviction under § 876.

The district court granted the government's motion to exclude Dr. Corvin's testimony. However, the district court did not prohibit Worrell, who testified in his own defense, from telling the jury that he suffered from "bipolar disorder and inter[mittent] explosive disorder," J.A. 254, that when he does not take his medication, he does not "really think about what [he is] doing before [he does] it," J.A. 255, and that, prior to writing the first letter to Theresa, he had been taken off of his medication. In fact, Worrell's attorney emphasized this point during his closing argument, suggesting to the jury that Worrell's "case would not be in front of you if it were not for the fact that, as Mr. Worrell testified, that he was taken off of his medication" and that "there were no letters submitted to you that were threatening while he was on his medication." J.A. 298.

On cross-examination, Worrell admitted writing the letters and mailing them to Theresa. He acknowledged that he understood that a letter must have an address and a zip code, that it requires a stamp and

that it is delivered by the Postal Service. Worrell's testimony also reflected his understanding of certain internal prison mail procedures. Worrell explained that as an inmate, he was entitled to three free stamps per week, and that he had already used his allotment when he sent the February 28 letter to Theresa. Because he was out of stamps, Worrell used a fellow inmate's name for the return address in order to obtain an extra stamp free of charge.

Worrell further conceded that he had been trying to scare Theresa with his letters, and one of the investigating agents testified that Worrell told him the purpose of the letters was to threaten Theresa in response to her apparent desire to obtain exclusive custody of his children. Given the history of physical abuse and threats of violence inflicted by Worrell, it probably would have been unreasonable for Theresa simply to dismiss these threats as harmless. Theresa testified that throughout her three-year relationship with Worrell, he regularly beat her with his fists if she said or did something that angered him. Theresa further testified that on one occasion, with the children present, Worrell held a gun near her head and threatened to shoot her. Although Worrell denied holding the gun close to her head, he admitted that he pulled a gun on Theresa and pointed it towards her from "about eight paces away." J.A. 273. He also admitted striking Theresa with his hand during their relationship.

The jury concluded that Worrell violated § 876 by mailing the February 28 and March 20 letters and returned a guilty verdict on both counts of the indictment. On appeal, Worrell challenges the district court's decision to exclude the evidence of his mental condition.

Worrell also appeals his sentence. Adopting the recommendation set forth in the presentence report, the district court applied a six-level enhancement based on Worrell's past abuse of Theresa, which the court concluded to be conduct evidencing Worrell's intent to carry out his threats. The district court also departed upward by one level based on its conclusion that Worrell's criminal history score failed to account for his extensive previous criminal activity. Worrell appeals the six-level enhancement, but he does not challenge the upward departure.

## II.

Worrell argues that the district court committed reversible error when it barred the introduction of Dr. Corvin's testimony about the effect of Worrell's unmedicated bipolar and intermittent explosive disorders at the time that Worrell wrote and mailed the letters to Theresa. Worrell contends that he intended to present this expert testimony to show that, "as a result of his impaired mental state, he did not possess the specific intent necessary to commit" the offense of conviction. Brief of Appellant at 14. Accordingly, he argues, IDRA did not preclude the introduction of such testimony because he was not pursuing an affirmative insanity defense.

### A.

IDRA codified the federal standard for an insanity defense, and provides as follows:

> (a) *Affirmative defense*.—It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

> (b) *Burden of proof*.—The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

18 U.S.C.A. § 17.

Prior to the enactment of IDRA, we followed the test formulated by the American Law Institute ("ALI") which provided, in part, that "[a] person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he *lacks substantial capacity* either to appreciate the criminality of his conduct or *to conform his conduct to the requirements of law*." *United States v. Chandler*, 393 F.2d 920, 926 (4th Cir. 1968) (en banc) (internal quo-

tation marks omitted) (emphasis added); *see United States v. Gould*, 741 F.2d 45, 47 (4th Cir. 1984) (explaining that "[t]he substantive 'insanity defense' rule in this circuit is the ALI test as adopted in *United States v. Chandler*"). The latter part of this definition, therefore, afforded a defense premised on lack of volitional control. That is, a defendant could escape criminal liability if he was able to prove he lacked substantial capacity to control his actions, even though he may have been aware of what he was doing and understood that his actions were unlawful.

In passing IDRA, Congress rejected the "volitional prong" of the ALI test. *See United States v. Cameron*, 907 F.2d 1051, 1061 (11th Cir. 1990); *United States v. Pohlot*, 827 F.2d 889, 896 (3rd Cir. 1987). IDRA expressly prohibits the use of any "[m]ental disease or defect" as a defense unless it demonstrates that the defendant "was unable to appreciate the nature and quality or the wrongfulness of his acts." 18 U.S.C.A. § 17. The language of the statute leaves no room for a defense that raises "any form of legal excuse based upon one's lack of volitional control" including "a diminished ability or failure to reflect adequately upon the consequences or nature of one's actions." *Cameron*, 907 F.2d at 1061.

Therefore, the government argued to the district court that IDRA absolutely bars the introduction of evidence regarding mental disease or defect unless the defendant is pursuing a formal affirmative insanity defense. Worrell, however, contended that he was not introducing evidence of his mental disorders to support an affirmative defense or legal excuse, but rather to negate one of the elements of the government's case. Specifically, Worrell asserted that as a result of his bipolar disorder and his intermittent explosive disorder, he did not possess the specific intent to mail threatening communications in violation of 18 U.S.C.A. § 876.

The district court did not specifically address the broad issue of whether IDRA permits a defendant who is not pursuing an insanity defense to use evidence of a mental disease or defect to negate specific intent. We note that, on appeal, the government has not vigorously pursued its position on this particular issue. Indeed, the circuits addressing this issue appear to agree that, despite IDRA, psychiatric testimony regarding a defendant's mental condition can still be used

in appropriate circumstances to disprove specific intent for specific intent crimes. *See Cameron*, 907 F.2d at 1063-66; *United States v. Newman*, 889 F.2d 88, 91-92 & n.1 (6th Cir. 1989); *United States v. Bartlett*, 856 F.2d 1071, 1081-82 (8th Cir. 1988); *United States v. Twine*, 853 F.2d 676, 678 79 (9th Cir. 1988); *Pohlot*, 827 F.2d at 897. This conclusion rests on the distinction between psychiatric testimony or evidence supporting an affirmative defense that "justif[ies] or excuse[s] conduct that is otherwise criminal," and psychiatric evidence that merely "aids the trier in determining the defendant's specific state of mind with regard to the actions she took at the time the charged offense was committed, . . . [which] is not an affirmative defense but is evidence that goes specifically to whether the prosecution has carried its burden of proving each essential element of the crime." *Cameron*, 907 F.2d at 1063 (internal quotation marks omitted). These decisions interpret IDRA as barring psychiatric evidence relating to a defendant's mental condition — short of insanity — if such evidence is in the nature of "a legal justification or excuse for otherwise criminal conduct," but permitting this type of evidence if, rather than justifying defendant's conduct, it "negates an essential element of the government's *prima facie* case." *Id.* at 1065. An example of inadmissible evidence regarding a defendant's mental condition would be testimony that a defendant, who failed to meet IDRA's definition of insanity, committed a crime because of a "supposed psychiatric compulsion or inability or failure to engage in normal reflection." *Pohlot*, 827 F.2d at 890.

This distinction seems clear enough in theory, if not in practice. We confess we have difficulty envisioning many scenarios in which a defendant could introduce psychiatric evidence, short of insanity, that was not simply diminished capacity evidence or some other form of justification in disguise. *See Cameron*, 907 F.2d at 1066 ("When a defendant claims to have psychiatric evidence that she 'lacked the capacity' or was 'incapable' of forming the intent necessary for the crime charged, most often that defendant is speaking of an incapacity to reflect or control the behaviors that produced the criminal conduct."); *Pohlot*, 827 F.2d at 900 ("Only in the rare case . . . will even a legally insane defendant actually lack the requisite mens rea purely because of mental defect."). Both the Eleventh and Third Circuits, which have considered this issue in depth, offer the same example of

an appropriate use of non-insanity psychiatric evidence to negate an element of the government's case:

> *United States v. Staggs*, 553 F.2d 1073 (7th Cir. 1977), provides an example of the appropriate use of "psychiatric evidence to negate specific intent." Mr. Staggs was charged with threatening to shoot a policeman. He denied making the threat and sought to introduce psychiatric evidence that he suffered from a mental condition that made it highly unlikely that he would make such a threat. The Seventh Circuit reversed the district court's exclusion of this evidence since it did not imply a legal excuse for the conduct engaged in by Staggs, nor did it suggest a theory of unconscious motivation or lack of volitional control. The evidence instead shed light on whether Staggs possessed a specific state of mind that would make him guilty of a more serious crime than his conduct alone would support.[3]

*Cameron*, 907 F.2d at 1067; *see Pohlot*, 827 F.2d at 897. In other words, Staggs was offering the psychiatric evidence to show he did not do it, not that he could not help it.

We are inclined to agree with those courts holding that IDRA does not prohibit psychiatric evidence of a mental condition short of insanity when such evidence is offered purely to rebut the government's evidence of specific intent, although such cases will be rare. In any event, we need not plumb the depths of this issue to determine that the district court properly excluded the testimony of Dr. Corvin.

B.

Assuming that IDRA permits psychiatric testimony to be presented to negate the specific intent element of a specific intent crime, Dr. Corvin's proposed testimony is simply not relevant to the issue of

---

[3]*Staggs* was overruled on grounds unrelated to this discussion. *See United States v. Ricketts*, 146 F.3d 492, 497 (7th Cir. 1998) (explaining that the Seventh Circuit no longer follows its conclusion in *Staggs* that 18 U.S.C.A. § 111 is a general intent crime).

specific intent in this case. Accordingly, the district court committed no error in its decision to exclude his testimony.

Worrell is correct that the offense of mailing a threatening communication under § 876 is a specific intent crime; however, that fact does not aid him. Section 876 does not require specific intent to threaten; rather, "[t]he only proof of specific intent required to support a conviction under . . . § 876 is that the defendant *knowingly deposits* a threatening letter in the mails, not that he intended or was able to carry out the threat." *United States v. Chatman*, 584 F.2d 1358, 1361 (4th Cir. 1978) (emphasis added). The proper focus is "on the act of mailing, not on the act of threatening." *United States v. Darby*, 37 F.3d 1059, 1065 (4th Cir. 1994). The government is required to prove only a general intent to threaten under § 876, *see United States v. Maxton*, 940 F.2d 103, 106 (4th Cir. 1991), which means that the communication must "encompass a 'true threat,'" *id.*; *see Darby*, 37 F.3d at 1065. A "true threat" is determined not by the defendant's subjective mindset, but by the objective standard of whether a "reasonable recipient who is familiar with the context of the letter would interpret it as a threat of injury." *Maxton*, 940 F.2d at 106 (internal quotation marks omitted).

The brief synopsis of Dr. Corvin's opinion appearing in the record, which is all we have to go by since Worrell made no proffer, does not address Worrell's intent, or lack of intent, to deposit threatening communications in the mails. Thus, Dr. Corvin's proposed opinion on its face provides no basis to negate the specific intent element the government must prove to secure a conviction under § 876. In fact, the only evidence we have regarding Worrell's specific intent to mail the letters is Worrell's own trial testimony, which establishes that Worrell understood the prison mail process and even manipulated the system to his advantage. Worrell acknowledged that he purposely placed the letters in the mail with the realization that the Postal Service would deliver them to the intended addressee.

Because Dr. Corvin's opinion, as summarized in his letter to defense counsel, does not address Worrell's intent to mail the letters and therefore fails to negate the specific intent required under § 876, we are left with precisely the kind of psychiatric evidence that IDRA precludes. Dr. Corvin's opinion was essentially that because Worrell

was not taking his medication at the time of the offenses, he was not able to exercise control over his actions or reflect on the possible consequences of his actions. Taking into account Worrell's acknowledgment that, when he is off of his medication, "I lose control, I try not to, but I lose it. . . I know I'm being stupid, but I still can't stop," J.A. 49, Dr. Corvin concluded that Worrell had the ability to understand the nature and quality of his actions but that he was psychiatrically impaired at the time of the offenses as indicated by his "impulsivity, mood swings, extreme irritability, disorganized thinking, and impaired judgment." J.A. 49. This evidence is clearly calculated to show that Worrell, because of his unmedicated bipolar and intermittent explosive disorders, was not able to control his behavior or reflect on potential consequences before acting. This is no different than evidence that Worrell lacked the ability to conform his behavior to the requirements of law. IDRA bars a defendant who is not pursuing an insanity defense from offering evidence of his lack of volitional control as an alternative defense. Accordingly, the district court properly excluded this evidence.

III.

Worrell next contends that the district court erroneously applied a six-level enhancement to his base offense level under the Sentencing Guidelines. The guideline for Worrell's offenses is contained in § 2A6.1 and, as is applicable to this case, sets a base offense level of 12 for threatening communications. *See* U.S.S.G. § 2A6.1(a)(1) (2000). Section 2A6.1 provides further that "[i]f the offense involved any conduct evidencing an intent to carry out such threat," the sentencing court must "increase [the base offense level] by 6 levels." U.S.S.G. § 2A6.1(b)(1).

The presentence report ("PSR") submitted to the district court recommended that the court apply this six-level enhancement because of Worrell's history of violence in his relationship with Theresa. The PSR referred generally to Worrell's violent conduct directed at Theresa and specifically identified two incidents in support of the recommendation that the enhancement be applied. According to the PSR, "[b]oth Ms. Roberson and Worrell have described situations in which the defendant physically and mentally abused Ms. Roberson," including one incident in which "Ms. Roberson was beaten so badly that her

eardrum was ruptured" and another in which "Worrell pointed a .25 caliber handgun at Roberson threatening to kill her," which led to Worrell's arrest and conviction. J.A. 499. And, as noted earlier, Theresa recounted during trial similar incidents of violence she suffered at the hands of Worrell over the course of their three-year relationship from 1994 to 1997. According to Theresa, she and Worrell got into disagreements a few times each week that would result in his striking her if she "said something wrong or something he didn't like." J.A. 198. Theresa also described the incident in which Worrell pointed a handgun at her head and threatened to shoot her. The district court concluded that the government had proven that Worrell had engaged in conduct evidencing his intent to carry out his threats, and, over Worrell's objection, adopted the recommendation of the PSR and applied the six-level enhancement pursuant to U.S.S.G. § 2A6.1(b)(1).

On appeal, Worrell makes a two-fold argument. First, he argues that the § 2A6.1(b)(1) enhancement does not apply to prior conduct unless such conduct is part of the offense itself or constitutes "relevant conduct," *see* U.S.S.G. § 1B1.3, and that conduct occurring years before the letters were mailed, like that cited in the PSR and relied upon by the government, does not qualify as either. Second, Worrell contends that even if such prior conduct could be considered under U.S.S.G. § 2A6.1(b)(1), the conduct in this case was simply not sufficiently connected to the offense. We address each of these arguments in turn.

A.

Worrell first argues that conduct occurring prior to the mailing of a threatening communication which is not part of the offense itself cannot be used to apply the six-level enhancement because, for the enhancement to apply, the guidelines require that "the *offense* involve[ ] . . . conduct evidencing an intent to carry out such threat." U.S.S.G. § 2A6.1(b)(1) (emphasis added). Worrell argues that the text of the guideline mandates that any conduct used as the basis for applying the enhancement under § 2A6.1(b)(1) must either be part of the offense itself or must qualify as "relevant conduct" under § 1B1.3 of the Sentencing Guidelines. In support of this contention, Worrell cites the commentary on the Guideline's "Application Instructions."

*See* U.S.S.G. § 1B1.1. The commentary provides a definition of "general applicability" for the term "offense": "'Offense' means the offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context." U.S.S.G. § 1B1.1, comment. (n.1(l)). Worrell suggests that his history of physically abusing Theresa occurred years before he mailed the threatening letters and is obviously not part of the offense. And, given that the government does not suggest that Worrell's prior acts constitute "relevant conduct," Worrell concludes that his past abuse of and threats against Theresa cannot be used to support the six-level enhancement.

Under a previous version of the Sentencing Guidelines, we held that prior conduct could properly be considered when determining whether the defendant engaged in conduct revealing an intent to follow through on the threats, justifying the application of the six-level enhancement. *See United States v. Gary*, 18 F.3d 1123, 1128 (4th Cir. 1994). Under the 1992 version of the Sentencing Guidelines, which applied in *Gary*, the six-level enhancement was appropriate "[i]f the *defendant engaged* in any conduct evidencing an intent to carry out such threat," U.S.S.G. § 2A6.1(b)(1) (1992) (emphasis added), as opposed to the current version, which asks whether "the *offense involved* any conduct evidencing an intent to carry out such threat," U.S.S.G. § 2A6.1(b)(1) (2000) (emphasis added). In *Gary*, we reviewed a sentence imposed in 1992 and held that "[a]ny acts that evidence an intent to carry out the threats on which a conviction is predicated, whether committed prior to or following such threats, may form the basis of the § 2A6.1(b)(1) adjustment." *Gary*, 18 F.3d at 1128. "[T]he pivotal inquiry is into the defendant's intent and the likelihood that the defendant would carry out the threat." *Id.* at 1127-28 (internal quotation marks omitted). *Gary* affirmed the application of the six-level enhancement based on threatening phone calls and visits to the victim that were not part of the offense under § 876 and that began more than six months before the offense conduct occurred. *See id.* at 1127-28.

In 1993, the Sentencing Commission amended § 2A6.1(b)(1) by deleting the phrase "[if] the defendant engaged" and instead providing that the enhancement applied if "the offense involved any conduct evidencing an intent to carry out such threat." U.S.S.G. § 2A6.1;

U.S.S.G. App. C, amend. 480 (1993). Worrell suggests that the amendment to § 2A6.1(b)(1) narrowed the scope of the enhancement to the extent that it no longer applies to conduct that occurred prior to the offense of mailing threatening communications.

We disagree. First, Amendment 480 was intended to broaden the scope of section 2A6.1(b)(1) by "delet[ing] language that could be construed as a limitation on the scope of conduct for which a defendant is accountable under § 1B1.3 (Relevant Conduct)." U.S.S.G. App. C, amend. 480 (1993). Amendment 480 "responded to the possibility that the previous language precluded consideration of any conduct of others for which a defendant was responsible under § 1B1.3," because the previous language focused on whether the *defendant's* conduct provided a basis for the enhancement. *United States v. Thomas*, 155 F.3d 833, 838 (7th Cir. 1998) (internal quotation marks omitted). Because Amendment 480 "made clear that a district court could consider the conduct of others for which the defendant is accountable under § 1B1.3," thereby effectively broadening the scope of § 2A6.1(b)(1), we agree with the Seventh Circuit that the amendment did not also "simultaneously *limit* the scope of the district court's inquiry to *only* relevant conduct." *Id.* at 839.

Second, the Sentencing Commission added commentary in 1997, almost four years before Worrell was sentenced in 2001, clarifying that prior conduct, even if it does not constitute "relevant conduct," may provide the basis for a six-level enhancement under § 2A6.1(b)(1) as long as there is a substantial and direct connection with the offense of conviction:

> In determining whether subsection[ ] (b)(1) . . . appl[ies], the court shall consider both conduct that occurred prior to the offense and conduct that occurred during the offense; however, conduct that occurred prior to the offense must be substantially and directly connected to the offense, under the facts of the case taken as a whole.

U.S.S.G. § 2A6.1, comment. note 2.

The Sentencing Commission explained that the addition of this commentary was intended to clear up a circuit split over "whether or

not conduct which occurred prior to the making of the threat can evidence an intent to carry out the [subsequent] threat." U.S.S.G., App. C, amend. 549 (1997). It is significant that in determining that pre-threat conduct may be used if there is a substantial and direct connection with the offense, the Sentencing Commission cited and relied upon *Gary*, among other decisions. *See id.* As mentioned before, *Gary* applied the six-level enhancement based on threatening conduct that occurred before the defendant violated § 876 by sending the threatening letters, and the prior conduct in *Gary* clearly was not part of the offense and did not constitute relevant conduct.

"[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it . . . is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993). Perceiving no such inconsistency here, we conclude that Application Note 2 to § 2A6.1(b)(1) clarifies the meaning of the guideline and permits a district court to use prior conduct for purposes of the six-level enhancement as long as the prior conduct is "substantially and directly connected" to the offense.[4] *See Thomas*, 155 F.3d at 838 (concluding that Amendment 549 "makes clear that § 2A6.1(b)(1) is not limited solely to relevant conduct, since the sentencing judge may consider all prior conduct that is substantially and directly related to the threatening communication.").

### B.

We now consider the remaining issue of whether Worrell's past abuse and threats to Theresa are sufficiently connected with his offense conduct to warrant the six-level enhancement for conduct evidencing the intent to carry out the threats in his letters. We review de novo a district court's application of the Sentencing Guidelines to a given factual scenario. *See United States v. Franks*, 183 F.3d 335, 337 (4th Cir. 1999). We believe that the connection between Worrell's prior abusive and threatening conduct towards Theresa and the letters

---

[4]Worrell does not develop the argument that the commentary to § 2A6.1(b)(1) is, on its face, at odds with the guideline itself. Although Worrell notes in his brief a potential conflict between the two, he concludes that any such conflict is "more apparent than real." Brief of Appellant at 31.

forming the basis for his convictions is sufficiently direct and substantial. Evidence of past violence and abuse inflicted upon the victim by the defendant, particularly when the threats refer to specific instances of such conduct, may demonstrate that the defendant is not merely blowing smoke but in fact is likely to follow through on his threats and, therefore, provides a basis for an enhancement under § 2A6.1(b)(1). *See United States v. Carter*, 111 F.3d 509, 513-14 (7th Cir. 1997) (applying the six-level enhancement under § 2A6.1(b)(1) based partially on defendant's frequent use of force against the victim during their prior relationship); *United States v. Sullivan*, 75 F.3d 297, 302 (7th Cir. 1996) (concluding enhancement under § 2A6.1(b)(1) was appropriate when the defendant sent a threatening letter that specifically referred to an incident in which the defendant had shot out the windows in the victim's truck three months earlier, thus "t[ying] the prior acts to the threats . . . [and] implicating 2A6.1" (internal quotation marks omitted)).

First, the threats Worrell made in his letters were clearly connected to the specifics of his prior acts of violence involving Theresa and therefore plainly conveyed his intent to carry them out. For example, in his March 20 letter, Worrell wrote, "No matter what the law says I can always get a gun and no one can stop what I plan on doing with it. Can you guess what I plan on doing? Bang-Bang Bitch. . . . you mu[st] pay with your life." J.A. 451-52. Worrell's selection of a gun as his weapon of choice was no accident, as his reference to it was obviously designed to remind Theresa of the time he had held a gun to her head and threatened to shoot her. Similarly, in his February 28 letter to Theresa, Worrell stated, "I intend to do some harm . . . and I will be loaded for bear. If you know what I mean." J.A. 445-46. Again, Worrell harkens Theresa back to the acts of violence she had personally witnessed, as a reminder to her of his ability and intent to inflict the harm he promises.

Significantly, Worrell's specific references to prior violent episodes were made against a backdrop of testimony showing that Theresa's involvement with Worrell was essentially a three-year continuum of threatened violence and physical abuse that proceeded on a weekly basis until Worrell was sent to prison. Accordingly, it does not take a great leap of logic to conclude that Worrell's abuse of Theresa would have continued but for the fact that he was incarcerated. In

other words, when Worrell wanted to strike her, he did. Worrell's history of violence against Theresa which continued unabated during their relationship clearly sheds light on Worrell's intent to carry out his threats, and Worrell's specific reference to a few of these incidents clearly links his past conduct with the fresh threats of harm contained in the letters. We do not find it difficult to conclude that Worrell's past conduct in this case is directly and substantially related to his offense.

Lest there be any doubt about Worrell's intent to draw on Theresa's past experiences with him to convey that his threats are real, Worrell also referred expressly in his February 28 letter to unfinished business with Theresa's stepfather, Mike, warning that "[t]his time, I will get Mike. The first time you stopped me. This time you won't." J.A. 446.

In short, the prior acts, though occurring some period of time before Worrell mailed the letters at issue, provided context for the threats contained in the letters, giving enhanced meaning to the language chosen and validity to the threats in general. By directly and indirectly referencing past episodes, Worrell was reminding Theresa that he had inflicted harm in the past and effectively demonstrating that he would do so again. Consequently, we conclude the prior acts were substantially and directly connected to the threats in the letters to show Worrell's intent to carry them out and that the district court was correct to apply the six-level enhancement.

IV.

For the foregoing reasons, we affirm Worrell's conviction and sentence.

*AFFIRMED*