Vacated by Supreme Court, January 24, 2005

**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

　　　　　　*Plaintiff-Appellee,*

v.

PETER KAY STERN, a/k/a Peter K. Stern,

　　　　　　*Defendant-Appellant.*

No. 02-4091

Appeal from the United States District Court
for the Western District of North Carolina, at Bryson City.
Lacy H. Thornburg, District Judge.
(CR-99-81)

Argued: February 27, 2004

Decided: April 23, 2004

Before NIEMEYER and SHEDD, Circuit Judges,
and HAMILTON, Senior Circuit Judge.

---

Affirmed by unpublished per curiam opinion.

---

## COUNSEL

**ARGUED:** John Kenneth Zwerling, ZWERLING & KEMLER, Alexandria, Virginia, for Appellant. David Alan Brown, Assistant United States Attorney, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Robert J. Conrad, Jr., United States Attorney, Brian Lee Whisler, Assistant United States Attorney, Charlotte, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

On December 7, 1999, a federal grand jury sitting in the Western District of North Carolina indicted Peter Kay Stern (Stern) on one count of conspiracy to submit false and fraudulent refund claims to the United States Internal Revenue Service (IRS), 18 U.S.C. § 286, one count of obstructing the work of IRS agents, 26 U.S.C. § 7212(a), one count of bank fraud, 18 U.S.C. § 1344, two counts of threatening a federal judge, 18 U.S.C. § 115, and two counts of using the United States Postal Service mail system to communicate threats to a federal judge, 18 U.S.C. § 876. Following a jury trial, Stern was convicted on all counts. The district court sentenced him to a term of 151 months' imprisonment. Stern noted a timely appeal.

On appeal, Stern challenges the sufficiency of the evidence with respect to his convictions on the obstruction of IRS agents, Count Two, and the bank fraud, Count Three. He also challenges all of his convictions on the basis that the district court judge abused his discretion by denying his (Stern's) motion for recusal. Finally, Stern challenges his sentence on various grounds. We affirm Stern's convictions and his sentence.

I.

A.   The Comptroller Warrants.

Beginning in or about November 1995, Stern traveled to Bozeman, Montana, where he attended anti-government seminars presented by Leroy Schweitzer (Schweitzer). Schweitzer and his followers, who were known as "Freeman," operated a compound in Montana, and while he was there, Stern attended a Freeman class, conducted by Schweitzer, during which Stern obtained at least seven documents, each titled "Comptroller Warrant."

Stern subsequently delivered one of these comptroller warrants, in the amount of $77,581.98 and numbered 1809, to the First Union National Bank (First Union) as complete satisfaction of his approximately $40,000 worth of outstanding loans with the bank. Stern requested that First Union refund him the difference in a cashier's check. First Union rejected the comptroller warrant on the ground that it was not a legitimate collectible document.

Stern transmitted some of his other comptroller warrants to other financial institutions and government entities. He also provided some of the comptroller warrants to friends and family members for their use in satisfying debt with financial institutions and the IRS, and for obtaining false and fraudulent refunds. In a letter dated January 3, 1996, the Comptroller of the Currency, Administrator of National Banks for the United States Treasury Department, notified Stern that the comptroller warrants were worthless financial instruments. Stern's conduct with respect to these comptroller warrants is the subject of Counts One and Three of the indictment. Count One charged Stern with conspiracy to submit false claims for payment to the IRS in order to receive false and fraudulent refunds, 18 U.S.C. § 286, and Count Three charged Stern with bank fraud, 18 U.S.C. § 1344.

B.   Obstruction of IRS Agents.

In June 1996, in response to IRS efforts to collect overdue federal income taxes from him for tax years 1991 through 1994, Stern began sending letters to the IRS in which he denied his tax obligations and threatened to penalize IRS Officer William Sizer in the amount of one million dollars, as well as report him to the criminal authorities. Thereafter, accompanied by IRS criminal investigator Frank Houle, IRS revenue agents met with Stern in an effort to explain his tax liability.

Shortly thereafter, Stern sent correspondence to the agents, threatening them with criminal investigations and possible arrest if they did not cease their collection activities. Some of Stern's threatening correspondence was purportedly issued by "Our One Supreme Court," which was a common law court located in Macon County, North Carolina. Stern greatly participated in creating Our One Supreme Court around the same time that he had attempted to negotiate the Comp-

troller Warrants. In response to Stern's threatening correspondence, some IRS agents began taking precautionary measures to ensure their own safety and the safety of their families.

In conducting a threat assessment of Stern, Agent Houle inquired of Stern about his association with Our One Supreme Court. Stern informed Agent Houle that he was the Chief Justice of Our One Supreme Court, and provided Agent Houle a copy of the court's rules. Such rules provided for marshals to serve process and a militia to enforce the dictates of the court with force in arms. Agent Houle's investigation also revealed that Our One Supreme Court had generated numerous documents threatening IRS employees with multimillion dollar judgments and the filing of liens.

Beginning on December 13, 1996, the IRS issued four or five levies on known income sources for Stern. Stern responded by sending "affidavit[s] of probable cause for the prosecution of criminal acts" to the IRS agents involved in his case, which documents specifically called for the arrest of such agents. (J.A. 226). Concerns for the safety of these IRS agents raised by these documents generally impeded such agents' ability to perform their official duties. In addition, Stern impeded IRS efforts to assess the value of his home by posting a "no trespassing" sign at the entrance to his property. Notably, the sign was specifically directed to federal law enforcement officers and federal civil servants, and warned of consequences to the trespasser.

Stern next filed a petition with the United States Court of Appeals for the Fourth Circuit, seeking injunctive relief to restrain the IRS from collecting unpaid taxes, penalties, and interest from him. In addition, the petition sought compensatory damages for the IRS's actions in attempting to collect his unpaid taxes and for alleged violations of the Freedom of Information Act, 5 U.S.C. § 522. This court denied Stern's petition as "devoid of merit." *In re: Peter Kay Stern*, 114 F.3d 1177, 1997 WL 325437 (4th Cir. June 16, 1997) (unpublished).

As the direct result of Stern's threatening and harassing conduct, the IRS ceased its collection activities with respect to Stern's federal income tax liabilities. At the time of Stern's criminal trial, his federal income tax liabilities remained outstanding.

Stern's conduct in response to the IRS's collection activities is the subject of Count Two of the indictment, which charged him with obstructing the work of IRS agents. 26 U.S.C. § 7212(a).

C.    Threatened Kidnappings of Two Federal Judges.

On January 30, 1996, Stern, in his capacity as Chief Justice of Our One Supreme Court, sent a package through the United States Postal Service to the federal courthouse in Charlotte, North Carolina. The package included documents issued by Our One Supreme Court and signed by Stern as Chief Justice, which documents threatened to kidnap United States District Judges Graham C. Mullen and Richard L. Voorhees, if federal prisoner John Anthony Norris was not released from federal custody. The threats led to heightened security measures for the federal judges involved and the district court in general.

Stern's conduct in this regard is the subject of Counts Four, Five, Six, and Seven of the indictment. Count Four charged Stern with threatening to kidnap Judge Mullen, "with intent to impede, intimidate, interfere with, and retaliate against Judge Mullen while he was engaged in or on account of the performance of his official duties," (J.A. 87). 18 U.S.C. § 115. Count Five charged the same crime as Count Four, with the exception that Judge Voorhees was the subject of the kidnapping threat. Count Six charged Stern with sending a threatening communication (*i.e.*, the threat to kidnap Judge Mullen) through the United States Postal Service. 18 U.S.C. § 876. Count Seven charged the same crime as Count Six, with the exception that Judge Voorhees was the subject of the kidnapping threat.

II.

We first address Stern's challenge to the sufficiency of the evidence to sustain his conviction on Count Two, for obstructing the work of IRS agents, in violation of 26 U.S.C. § 7212(a). His challenge is without merit.

In reviewing the sufficiency of the evidence to support a criminal conviction, we view the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the government, and

we must sustain the verdict "if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Lomax*, 293 F.3d 701, 705 (4th Cir.) (internal quotation marks omitted), *cert. denied*, 537 U.S. 1031 (2002).

Section 7212(a) states that "[w]hoever corruptly or by force or threat of force (including any threatening letter or communication) endeavors to intimidate or impede any officer or employee of the United States acting in an official capacity under this title . . ." shall be guilty of a crime. 26 U.S.C. § 7212(a). We have interpreted the term "corruptly," as found in this statute, to mean acting "with the intent to secure an unlawful benefit either for oneself or for another." *United States v. Wilson*, 118 F.3d 228, 234 (4th Cir. 1997).

Count Two charged Stern with violating 26 U.S.C. § 7212(a) by corruptly endeavoring "to obstruct or impede the due administration of the internal revenue laws . . . ." (J.A. 84). Viewing the evidence in this case, and the reasonable inferences to be drawn therefrom, in the light most favorable to the government, leads to the inescapable conclusion that a rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime charged in Count Two. We hold that Stern's actions in mailing physically and legally threatening communications to the IRS agents involved in his case in order to halt their collection activities, as well as his action in posting the threatening "no trespassing" sign at the entrance to his property directed to federal law enforcement officers and federal civil servants, are sufficient to sustain his conviction on Count Two.

## III.

We next address Stern's challenge to the sufficiency of the evidence to sustain his conviction on Count Three for bank fraud, in violation of 18 U.S.C. § 1344. With respect to this count, Stern only challenges the sufficiency of the evidence to establish that First Union was federally insured at the time of his offense conduct; an essential element of his federal bank fraud offense. 18 U.S.C. §§ 20, 1344; *see, e.g.*, *United States v. Brandon*, 17 F.3d 409, 424 (1st Cir. 1994). Stern's challenge is without merit.

At Stern's trial in July 2000, the government sought to prove First Union's federally insured status at the time of Stern's conduct as

charged in Count Three (*i.e.*, December 16, 1995) via a certificate issued by the Federal Deposit Insurance Corporation (FDIC) on February 26, 1998. The certificate certified that "the deposits of each depositor in" First Union "are insured to the maximum amount provided by the Federal Deposit Insurance Act." (J.A. 1025-H). The government introduced this FDIC certificate through the testimony of First Union district manager Victor Cordone (Cordone). The government showed Cordone the 1998 FDIC certificate and asked him to identify it. In response, Cordone testified: "This is our certificate from the FDIC." (J.A. 402). The government then asked: "What does that mean?" *Id.* Cordone responded: "This is just a notice that we publish out in the office that we are in fact insured for all depositors up to $100,000." (J.A. 402).

Stern argues the February 1998 FDIC certificate offered by the government and Cordone's testimony does not collectively prove the federally insured status of First Union on December 16, 1995. Rather, he claims, such evidence only proves First Union's federally insured status a little over two years after the criminal conduct charged in Count Three.

We, ourselves, are puzzled as to why the government did not take a more straightforward approach in proving the federally insured status of First Union as of December 1995. For example, the government could have submitted an FDIC certificate for First Union contemporaneous with that time. Nevertheless, we hold a rational trier of fact, viewing the 1998 FDIC certificate *and* Cordone's testimony in the light most favorable to the government, could have found that First Union was federally insured at the time of Stern's conduct as charged in Count Two.

Our holding is supported by our decision in *United States v. Safley*, 408 F.2d 603 (4th Cir. 1969). In *Safley*, the defendants challenged their federal bank robbery convictions on the ground that "the evidence was insufficient to establish that the deposits of the bank were insured by the [FDIC]." *Id.* at 605. At trial, a bank employee had testified that the deposits "'are' insured by the [FDIC]." *Id.* We observed that this testimony, taken literally, could have referred to the time of trial. *Id.* We also observed that, when considered in context, the testimony could have referred to the time of the robbery. *Id.* On appeal,

we held that the testimony, when viewed in the context of all the evidence, was sufficient to prove the federally insured status element, since the "jury could draw the reasonable inference that the bank was insured at the time of the robbery." *Id.*

The logic of *Safley* applies equally in the present case. From the evidence of insurance in the present case (*i.e.*, the 1998 FDIC certificate and Cordone's testimony), the jury could have drawn the reasonable inference that First Union was federally insured in December 1995. Critical to our conclusion is the fact that Cordone, similar to the bank employee in *Safley*, testified, in referring generically to the FDIC certificate in front of him, that "we *are* in fact insured for all depositors up to $100,000." (J.A. 402) (emphasis added). In sum, we affirm Stern's bank fraud conviction.

## IV.

Following an overview explanation of the district court's sentencing calculations with respect to Stern, we will address two of Stern's numerous challenges to his sentence under the United States Sentencing Guidelines (Sentencing Guidelines or USSG).

The district court determined Stern's Criminal History Category under the Sentencing Guidelines to be Category I. In determining Stern's offense level under the Sentencing Guidelines, the district court used the grouping rules, USSG Ch.3, Pt.D, to group the seven counts on which Stern was convicted into four groups. The first group consisted of Counts One (18 U.S.C. § 286) and Three (18 U.S.C. § 1344). The second group consisted only of Count Two (26 U.S.C. § 7212(a)), and produced the highest sentencing range of all the groups at 87 to 108 months' imprisonment.[1] The third group consisted of Counts Four (§ 115) and Six (§ 876); while the fourth and last group consisted of Counts Five (§ 115) and Seven (§ 876). With the addition of offense levels as provided in USSG § 3D1.4, Stern had a

---

[1]While the revised Presentence Report recommended that Count Two be grouped with Counts One and Three, for a total of three sentencing groups as opposed to four, we find no error in the district court's treatment of Count Two as a separate group, for a total of four sentencing groups as opposed to three, pursuant to USSG § 3D1.1.

combined adjusted offense level of 32. When this number was combined with Stern's Criminal History Category of I, Stern had a sentencing range of 121 to 151 months' imprisonment. The district court sentenced Stern to the highest sentence in this range.

A.

We first address Stern's challenge to the district court's application of a six level enhancement to his base offense level for Counts Four and Six (Group Three), and Counts Five and Seven (Group Four), respectively, pursuant to USSG § 2A6.1(b)(1), for conduct evidencing Stern's intent to carry out his kidnapping threats against Judges Mullen and Voorhees. His challenge is without merit.

USSG § 2A6.1(b)(1) provides for a six level increase in a defendant's base offense level for violation of 18 U.S.C. § 115 and § 876 "[i]f the offense involved any conduct evidencing an intent to carry out such a threat." Commentary to this Guideline provides that:

> In determining whether subsection[ ] (b)(1) . . . appl[ies], the court shall consider both conduct that occurred prior to the offense and conduct that occurred during the offense; however, conduct that occurred prior to the offense must be substantially and directly connected to the offense, under the facts of the case taken as a whole.

USSG § 2A6.1, comment. (n.2). "We review de novo a district court's application of the Sentencing Guidelines to a given factual scenario." *United States v. Worrell*, 313 F.3d 867, 878 (4th Cir. 2002) (reviewing challenge to USSG § 2A6.1(b)(1) enhancement).

The record supports the district court's determination that Stern exhibited conduct evidencing his intent to carry out his kidnapping threats against Judges Mullen and Voorhees. Critical, in our view, is the evidence that Stern was the Chief Justice of Our One Supreme Court, a court largely created by him and which had a court rule providing that its dictates would be enforced by armed militia. Stern also kept many firearms at his home within easy reach, some of which he kept loaded. When all of this evidence is considered, as a whole, with

Stern's threats in the kidnapping documents to use Our One Supreme Court's "lawful special appointed constables [to] make appropriate apprehension of" Judges Mullen and Voorhees unless such individuals met the court's demand to release John Anthony Norris, the conclusion is inescapable that Stern engaged in conduct substantially and directly connected to the offense, which evidenced his intent to carry out the threats. Accordingly, we uphold the district court's enhancements pursuant to USSG § 2A6.1(b)(1).

B.

We next address Stern's challenge to the district court's enhancement of his base offense level for grouped Counts One and Three (Group One) by two levels, pursuant to USSG § 2F1.1(b)(4)(A).[2] Enhancement under this Guideline section is appropriate if the offense or offenses at issue involved "a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization, or a government agency . . . ." *Id.*

The revised Presentence Report for Stern recommended that the enhancement apply on the basis that:

> The evidence reflects Stern created and used an illegal religious/political court entitled the "Our One Supreme Court" to facilitate/legitimize the submission of the fictitious comptroller warrants. This common law court was created to oppose the laws, rules and regulations established by the United States of America.

(J.A. 1130). Stern objected to the enhancement, but the district court overruled the objection on the reasoning of the revised Presentence Report.

On appeal, the government asserts that Stern's use of the comptroller warrants qualifies as a misrepresentation that he was acting on behalf of a government agency, because Government Exhibit 12-1,

---

[2]Effective November 1, 2001, USSG § 2F1.1 was deleted by consolidation with USSG § 2B1.1. *See* USSG App. C, amendment 617.

which is representative of the numerous comptroller warrants that Stern and others attempted to submit to First Union National Bank and other financial institutions, shows that it is redeemable at the "office of the PostMaster," (J.A. 1025-A), and would be drawn on an account with the "Treasurer United States of America." *Id.*

We agree with Stern that the district court erred in applying the enhancement. The record is devoid of evidence that, in attempting to negotiate the so-called comptroller warrants, Stern made a misrepresentation that he was acting on behalf of a charitable, education, religious, or political organization, or a government agency. Critically, in attempting to negotiate the comptroller warrants, Stern only represented himself as the drawee on such warrants. There is no evidence in the record to even suggest that he represented that he was acting on behalf of the United States Treasury or the Postal Service in attempting to negotiate the comptroller warrants. In sum, the district court erred in applying a two level enhancement pursuant to USSG § 2F1.1(b)(4)(A).

Unfortunately for Stern, however, even without the § 2F1.1(b)(4)(A) enhancement, pursuant to the correct application of the Sentencing Guidelines for "Determining the Combined Offense Level," USSG § 3D1.4, his sentencing range is the same. Accordingly, the district court's error in applying the § 2F1.1(b)(4)(A) enhancement is harmless and a remand for resentencing is unnecessary.

## V.

In conclusion, we affirm all of Stern's convictions and his sentence.[3]

*AFFIRMED*

---

[3]We have reviewed Stern's remaining assignments of error and find them to be without merit.