**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-4138**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

NICHOLAS YOUNG,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Leonie M. Brinkema, District Judge. (1:16-cr-00265-LMB-1)

Argued: November 1, 2018                    Decided: February 21, 2019

Before AGEE, KEENAN, and RICHARDSON, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion. Judge Agee wrote the opinion, in which Judge Keenan and Judge Richardson joined.

**ARGUED:** Nicholas David Smith, DAVID B. SMITH, PLLC, Alexandria, Virginia, for Appellant. Gordon D. Kromberg, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** G. Zachary Terwilliger, United States Attorney, John T. Gibbs, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

AGEE, Circuit Judge:

A jury in the United States District Court for the Eastern District of Virginia convicted Nicholas Young of one count of attempting to provide material support to the Islamic State of Iraq and the Levant ("ISIL"), a designated foreign terrorist organization ("FTO"), in violation of 18 U.S.C. § 2339B, as well as two counts of attempting to obstruct justice, in violation of 18 U.S.C. § 1512(c)(2). Asserting a host of district court errors, Young challenges his convictions and sentence. For the following reasons, we affirm the material support conviction, vacate the obstruction convictions, and remand for resentencing.

I.

In 2010, the Federal Bureau of Investigation ("FBI") opened a counterterrorism investigation into Young, a police officer with the Washington Metropolitan Area Transit Authority, prompted in part by his connections to an acquaintance who had been arrested on 18 U.S.C. § 2339B charges. That December, "Khalil," an undercover FBI agent, began maintaining contact with Young, who would discuss with Khalil his wariness of FBI surveillance, the measures he had taken to thwart such surveillance, and the skills needed—which he purported to possess—to attack an FBI or a federal office. During this period, law enforcement also observed Young traveling to and from Libya, though law enforcement was unable to determine the purpose of his trips. Khalil's contact with Young eventually concluded in April 2012.

2

In May 2014, the FBI again began observing Young more actively after an FBI informant, "Mo," met Young through Young's acquaintances, whom Mo was monitoring. Over the next several months, Mo and Young met approximately 20 times. During their meetings, Mo indicated that he was interested in traveling to Syria to join ISIL. Young in turn offered advice on how to travel overseas without being flagged by government authorities. Specifically, Young suggested that Mo devise a cover story for his trip, such as pretending that he was taking a guided tour of Turkey (or that he actually take such a tour). Young also advised Mo to book a roundtrip ticket and volunteered to send a text to Mo a few days after Mo's "return date" to assist Mo in evading law enforcement suspicion, explaining that the text would make it look like Young was expecting Mo's return (rather than staying on in the region to travel to ISIL-controlled territory). Finally, Young and Mo set up covert email accounts to communicate.

That October, Mo traveled to Turkey with his FBI handler, Special Agent John Minichello. While there, Mo emailed Young that he was planning to travel to ISIL-controlled territory in Syria. Mo then returned to the U.S. In November 2014, Young sent Mo the pre-arranged text message: "Hope you had a good vacation. If you want to grab lunch . . . hit me up." J.A. 566:3–5. After forwarding that message to Agent Minichello, Mo's involvement in the investigation concluded; from that point on, Agent Minichello and another agent impersonated Mo to Young through the email account.

In subsequent emails to Mo, Young made it clear that he believed Mo had joined ISIL. In 2015, Young asked Mo to mention him to any Libyan ISIL members Mo might encounter and to tell them that Young had been in Libya with the Abu Salem Martyrs'

3

Brigade, a militia group with connections to al Qaeda that had been fighting Muammar al Qaddafi's regime. Young also emailed his contacts in the Brigade on Mo's behalf.

On December 3 and 5, 2015, two FBI agents interviewed Young. Although the agents purported to be questioning Young about Mo's whereabouts, they were attempting to determine whether Young himself was in contact with any terrorists. During the interviews, Young denied having current contact information for Mo. He informed the agents that he believed Mo had gone on vacation but that he had not been in touch with Mo since October 2014. He also denied knowing anyone who had given Mo travel guidance. Young later emailed Mo to inform him about the FBI's inquiry.

In April 2016, Mo suggested to Young that they should communicate through an encrypted messaging app, Threema. In July, Young created a Threema account and received a message from Mo noting that ISIL needed more fighters. Mo explained that Google gift cards could be used to buy Threema accounts to help fighters communicate with ISIL, thereby facilitating their travel to ISIL-controlled territory. At the end of the month, Young used Threema to transmit $245 in Google gift cards to Mo. After confirming that Mo had received the cards, Young responded that he was "glad" and would be disposing of the device used to communicate with Mo. J.A. 868:13.

In August 2016, Young was arrested for attempted material support of ISIL, an FTO. On the day of his arrest, agents executed a search warrant and seized militant Islamist, Nazi, and white supremacist paraphernalia as well as weapons from his home. An indictment subsequently charged Young with attempting to provide material support—the gift cards—to a designated FTO, in violation of 18 U.S.C. § 2339B (Count

4

One), and attempting to obstruct—during the 2015 interviews (Count Two) and with the November 2014 text (Count Four)—an official proceeding, in violation of 18 U.S.C. § 1512(c)(2).[1] Young proceeded to a trial on these counts. The jury convicted Young of all three counts and the district court imposed a below-Guidelines sentence of 180 months as to each count, with the sentences to run concurrently.

Young timely appealed, asserting five sets of errors by the district court. The first three concern Count One, to which Young had asserted an entrapment defense during trial. To establish Young's predisposition to commit the offense conduct, the Government had introduced evidence of the seized items over Young's objections. On appeal, Young asserts in Ground One that the district court erred by admitting into evidence the white supremacist and Nazi paraphernalia. Ground Two contends that the district court erroneously certified an expert witness on militant Islamist and Nazi "convergence." Ground Three asserts that a number of the district court's evidentiary rulings deprived Young of his due process right to a fair trial. Ground Four posits that the Government failed to offer sufficient evidence to prove the two attempted obstruction of justice charges. Finally, Ground Five asserts that his sentence was both procedurally erroneous and substantively unreasonable.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.


## II. Grounds One to Three: Entrapment-Centered Challenges

---

[1] Count Three, charging a violation of 18 U.S.C. § 1512(b)(3), was dismissed as duplicative.

At trial, Young presented an entrapment defense to Count One, which charged Young with attempting to provide material support to a designated FTO. To establish entrapment, a defendant must first demonstrate the government induced him to engage in the criminal activity. *United States v. McLaurin*, 764 F.3d 372, 380 (4th Cir. 2014). Once the defendant has shown government inducement, the burden shifts to the government to prove beyond a reasonable doubt the defendant's predisposition to have engaged in the criminal conduct. *United States v. Jones*, 976 F.2d 176, 179 (4th Cir. 1992). Predisposition "focuses upon whether the defendant was an unwary innocent or, instead, an unwary criminal who readily availed himself of the opportunity to perpetrate the crime." *Mathews v. United States*, 485 U.S. 58, 63 (1988).[2] To establish Young's predisposition to commit the offense conduct, the Government introduced evidence of Young's interest in radical, anti-Semitic terrorist causes both before and after his first contact with Khalil in 2010. *See Jacobson v. United States*, 503 U.S. 540, 548–50 (1992) (holding that predisposition must be established prior to the defendant's first contact with a government agent). This evidence included Nazi and white supremacist paraphernalia seized from Young's home, expert testimony regarding the "convergence" of Nazism and militant Islamism, and testimony about Young's prior support for such causes. Young contests the admission of that evidence as well as the exclusion of other purportedly exculpatory evidence.

---

[2] We have omitted internal quotation marks, alterations, and citations here and throughout this opinion, unless otherwise noted.

6

In reviewing evidentiary rulings, this Court reviews the district court's legal conclusions de novo and its factual findings for clear error. *United States v. Kolsuz*, 890 F.3d 133, 141–42 (4th Cir. 2018). Such rulings are reviewed for abuse of discretion and overturned only if the error was not harmless. *United States v. Cloud*, 680 F.3d 396, 401 (4th Cir. 2012); *United States v. Forrest*, 429 F.3d 73, 81 (4th Cir. 2005) (concerning expert testimony).

### A. Ground One: Nazi and White Supremacist Paraphernalia

To prove Young's predisposition to assist an FTO, the Government introduced Nazi and white supremacist paraphernalia seized from Young's home pursuant to a search warrant. The warrant had authorized the seizure of "[a]ll records, documents, and paraphernalia . . . relating to ISIL/ISIS," as well as "other designated terrorist groups, or any individual or group engaged in terrorism or terrorist activity, or communications with or involving such groups and/or individuals." J.A. 56; 66. After finding the items in Young's home and consulting with a Government attorney, law enforcement seized the materials.

The Government then moved to admit this evidence (1) to corroborate testimony from Young's college friends and former housemates concerning his pre-2010 interest in these causes[3] and (2) to further illustrate his interest in a historical and modern-day

---

[3] Specifically, Young's college friend testified that after they had attended a 2001 gathering of neo-Nazis for a school project, Young told him not to discount an alliance between Nazis and Muslims to combat Jews. And Young's former housemates testified that Young had listened to racially inflammatory music and used an Israeli flag as a doormat to make an anti-Semitic statement. To corroborate this testimony, the (Continued)

connection between Nazis and militant Islamists. To this latter point, the Government introduced, among other items, a poster Young had downloaded in 2007 depicting a Nazi shaking hands with the Mufti of Jerusalem—who had allied himself with Adolf Hitler and recruited Muslim troops to serve in the SS—titled "The Alliance: Worldwide Association of Nazis and Islamists 1939–2004," Response Br. 35; photos of the Mufti and Hitler as well as the Mufti and Muslim SS troops; Young's prayer list, which included Hitler and the Mufti; a 2007 photo on his computer of Muslim women with a sign saying, "God Bless Hitler," J.A. 1636; a copy of Young's Facebook page from 2011, in which Young linked to a story about the arrest of neo-Nazi turned jihadist Emerson Begolly; and a 2014 graphic on his phone with the words, "Together, we can finish what Hitler started," J.A. 1633.

Young moved prior to trial to suppress the admission of the Nazi and white supremacist paraphernalia based on two asserted errors: first, the seizure of the items exceeded the warrant's scope and second, their admission violated Federal Rules of Evidence 401 and 403. The district court denied the motion, and Young challenges the district court's holding based on these two alleged errors. We consider each in turn and affirm the district court's rulings.

### 1. Scope of the Search Warrant

---

Government introduced, among other items, a copy of a neo-Nazi book that Young had gifted to his college friend; a flyer for a "white power" music company; and an anti-Semitic graphic that Young had downloaded to his computer in 2007.

Young contends the items should have been suppressed because they were outside the scope of the warrant. He argues the warrant—which permitted the seizure of items related to ISIL as well as "other designated terrorist groups," J.A. 56; 66—did not authorize the seizure of the Nazi and white supremacist items, both because they were not included within the warrant's language and because he was not being investigated for a hate crime. The district court rejected Young's arguments, concluding that the items fell within the scope of the search warrant's expansive language.

"When a search is conducted pursuant to a warrant, it is limited in scope by the terms of the warrant's authorization," but these terms "are not to be interpreted in a hypertechnical manner." *United States v. Williams*, 592 F.3d 511, 519 (4th Cir. 2010). Instead, a warrant should be read in a "commonsense and realistic" manner. *United States v. Phillips*, 588 F.3d 218, 223 (4th Cir. 2009). Agents may seize an item pursuant to a warrant even if it "does not expressly mention and painstakingly describe it," *id.* at 225, because the specificity required may "vary according to the circumstances and type of items involved." *In re Grand Jury Subpoena*, 920 F.2d 235, 239 (4th Cir. 1990).

We conclude the seizure of the items here did not exceed the scope of the warrant. First, as the district court correctly recognized, even if Nazi organizations are not designated FTOs, a reasonable officer would be able to draw on common knowledge to conclude that the Nazis' threats and use of violence as a means of achieving their political ends meant that Nazis engaged in terroristic activity as defined by the U.S. Code

9

and Black's Law Dictionary.[4] *See also United States v. Young*, 260 F. Supp. 3d 530, 554–55 (E.D. Va. 2017). Second, some of the items illustrated a historical and present-day connection between Nazism and radical Islamism. Third, the Criminal Complaint Affidavit provided examples of Young's affiliation with both Nazism and radical Islamism: the Affidavit described how Young had told law enforcement he had dressed up both as a "Jihadi John" and a Nazi, had collected Nazi memorabilia, and had a tattoo of a German eagle on his neck. J.A. 43. Given this information, agents reasonably concluded both that Nazis qualified as a terrorist organization and that as to this particular case, the Nazi paraphernalia was relevant to or probative of material support for a terrorist organization. For these reasons, we conclude the district court did not err in declining to suppress these items.

2. Federal Rules of Evidence 401 and 403

Even if the items were properly seized, Young argues that they nonetheless should have been excluded under Federal Rules of Evidence 401 and 403. He contends that under Rule 401, the materials were irrelevant because Nazism and militant Islamism are mutually exclusive belief systems. And under Rule 403, he asserts that the items were unfairly prejudicial because they did not tend to prove Young's predisposition. But the

---

[4] 18 U.S.C. § 2331(1) and (5) define "terrorism" as activities that: (1) involve violent acts violative of federal or state criminal laws; and (2) appear to be intended to intimidate a civilian population, influence government policy by intimidation or coercion, or affect government conduct through mass destruction, assassination, or kidnapping. Similarly, Black's Law Dictionary defines terrorism as "[t]he use or threat of violence to intimidate or cause panic, esp. as a means of achieving a political end." *Terrorism*, BLACK'S LAW DICTIONARY (10th ed. 2014).

district court determined that the evidence was neither unfairly irrelevant nor prejudicial because for this particular defendant, predisposition encompassed "the convergence between Nazis and Islamist terrorists." J.A. 136.

With respect to relevance, we conclude the district court did not abuse its discretion in rejecting Young's argument because Young's advancement of the entrapment defense increased the scope of the relevant evidence. Under Rule 401, evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action. Specifically as to this case, "a broad swath of evidence, including aspects of the defendant's character and criminal past, [was] relevant to proving predisposition." *McLaurin*, 764 F.3d at 381. This is because predisposition "refers to the defendant's state of mind before government agents make any suggestion that he shall commit a crime," and so is a "broad concept" that requires distinguishing the "unwary innocent" from the "unwary criminal." *Id.* (finding that certain bad act evidence may be admissible under Rule 404(b) in entrapment cases). In this vein, "[p]redisposition is not limited only to the crimes specifically contemplated by the defendant prior to government suggestion[.]" *United States v. Ramos*, 462 F.3d 329, 334–35 (4th Cir. 2006); *see also United States v. Cromitie*, 727 F.3d 194, 207 (2d Cir. 2013) (concluding in a terrorism case that, to show predisposition, a defendant's relevant prior design to commit the crime could include a generalized intent to inflict harm on the U.S.).

Here, the district court correctly recognized that Nazism and militant Islamism share common ground—specifically, radical, anti-Semitic viewpoints. Given that the

11

items seized were probative of (1) Young's predisposition to support such viewpoints, and (2) the length of such a predisposition, the items were relevant to meeting the Government's burden to prove Young's predisposition to support terrorist activity. *See, e.g.*, *United States v. Mostafa*, 16 F. Supp. 3d 236, 266–67 (S.D.N.Y. 2014) (concluding a defendant's statement that "everybody wants to kill [Jews, including Hitler]" was "relevant to the defendant's motive and intent regarding violent jihad").

Second, even if, as Young contends, Nazism and militant Islamism are mutually exclusive belief systems, absolute consistency of belief is not a prerequisite to proving predisposition. Other circuits have recognized that seemingly inconsistent belief in a terrorist group's ideology does not preclude a finding by a court that a defendant either supported that group in a criminal fashion or was predisposed to do so. *See United States v. Van Haften*, 881 F.3d 543, 544 (7th Cir. 2018) (affirming the application of a terrorism enhancement at a sentencing for material support of ISIL despite defendant's support for a variety of ideologies and evidence suggesting he had at times disclaimed his support for ISIL); *see also Cromitie*, 727 F.3d at 215 (finding that moments of wavering did not preclude a finding of predisposition in a terrorism case).

This does not end the analysis, however, because under Rule 403 a court "may exclude relevant evidence if its probative value is substantially outweighed by danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Here, as discussed, the district court properly concluded the evidence was highly probative of Young's particular predisposition to support ISIL. *See United States v. Siraj*, No. 07-

12

0224-cr, 2008 WL 2675826, at *2 (2d Cir. July 9, 2008) (affirming the admission of allegedly prejudicial radical Islamist books from the bookstore at which the defendant had worked because to the extent the defendant recommended the books, "they were relevant to show predisposition," and to the extent that they were for sale, they "tended to rebut [the defendant's] assertion that the cooperating witness first exposed him to radical Islam and violent jihad"). This highly probative value meant that any prejudicial effect was not unfair. *Sorrells v. United States*, 287 U.S. 435, 452 (1932) (noting that if a defendant presents an entrapment defense and suffers a disadvantage, "he has brought it upon himself by reason of the nature of the defense").

Furthermore, any prejudicial effect was blunted by the district court's limiting instructions to the jury, which specifically cautioned:

> So I want you to understand that he is not being charged and you cannot find him guilty for possessing Nazi or anti-Semitic literature. He's not being charged with that, he cannot be convicted for that, but the evidence is being allowed in [to consider] . . . whether or not it helps or doesn't help to establish the predisposition issue, all right?

J.A. 980. *See also United States v. Crowden*, 882 F.3d 464, 473 (4th Cir. 2018) ("[A]ny prejudicial effect was reduced by the district court's issuance of two sets of limiting instructions[.]"). For these reasons, we conclude the district court's admission of the Nazi and white supremacist paraphernalia did not constitute an abuse of discretion and therefore affirm the district court's denial of the motion to suppress.

## B. Ground Two: Expert Certification

At trial, the Government called Dr. Daveed Gartenstein-Ross as an expert witness regarding (1) violent extremist movements claiming inspiration from Islam; (2) white

13

separatists and the neo-Nazi movement; (3) the radicalization processes for such groups; and (4) the Libyan Civil War. Dr. Gartenstein-Ross also explained points of overlap between Nazism and radical Islamism with examples of individuals who had subscribed to both philosophies. Expert testimony is admissible under Federal Rule of Evidence 702 if it involves specialized knowledge that will assist the trier of fact in understanding the evidence or determining a fact in issue, and is both reliable and relevant. *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589–92 (1993). In admitting Dr. Gartenstein-Ross' testimony, the district court found that "his background," "his extensive academic credentials," "the fact that the United States government uses him for training in these areas," and his prior work as an expert in other contexts sufficiently qualified him as an expert witness. J.A. 212–13. The district court also concluded his testimony was relevant. Although Young contends that the testimony of Dr. Gartenstein-Ross was neither reliable nor relevant, we agree with the district court's conclusions.

With respect to reliability, Young contends that Dr. Gartenstein-Ross had never testified in a civil or criminal proceeding on these issues; had not published his thesis on the "convergence" of white supremacism and militant Islamism in peer-reviewed journals; had not authored any studies on far-right radicalization; and had yet to perform any empirical analysis on this matter in the field. *See United States v. Hassan*, 742 F.3d 104, 131 (4th Cir. 2014) (affirming the admission of expert testimony on homegrown terrorism in a material support case where the court had "previously approved of [the expert's] expertise in terrorism matters" and the expert's methods had been subjected to peer review). But under the highly deferential standard afforded to the district court in

14

determining an expert witness's reliability, the district court did not abuse its discretion in determining that Dr. Gartenstein-Ross was reliable.[5]  Even when an expert has never previously been qualified, "it is the *quality*" of the expert's qualifications that a district court must focus on.  *United States v. Garcia*, 752 F.3d 382, 391 (4th Cir. 2014).  Here, the district court considered Young's concerns yet reached a reasonable decision in qualifying Dr. Gartenstein-Ross based on his extensive credentials and areas of expertise.[6]  And although publishing in a peer-reviewed publication is often a hallmark of expert witness reliability, that hallmark is a guidepost, not a mandatory prerequisite to qualification as an expert.  *See Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (noting *Daubert*'s "list of specific factors neither necessarily nor exclusively applies to all experts").

In turn, the district court did not abuse its discretion in accepting Dr. Gartenstein-Ross' social sciences-based methodology.  At trial, Dr. Gartenstein-Ross explained that he conducted his research "through a comparative method," focusing on primary sources, then comparing his conclusions against secondary sources and "events on the ground."

---

[5] Furthermore, contrary to Young's assertion, a *Daubert* hearing was not required. A district court need not hold a hearing if, after being presented with a proposed expert's "substantial" credentials and training, it concludes "[t]his training and experience amply [qualifies the expert] to give testimony [on the topic for which he or she is being qualified]." *United States v. Beasley*, 495 F.3d 142, 150 (4th Cir. 2007). Here, as discussed below, the district court reviewed Dr. Gartenstein-Ross' credentials and concluded he was qualified to give expert testimony.

[6] These credentials included: training on radical groups for federal agencies; teaching university courses on violent non-state actors; consultation on the Libyan Civil War for the U.S. government; field research on jihadist recruiting in the Middle East; and testimony in immigration cases on the Taliban and al Qaeda.

J.A. 1124–25. This methodology appears to be indistinguishable from that which we approved in *United States v. Hammoud*, 381 F.3d 316 (4th Cir. 2004), *rev'd on other grounds*, 543 U.S. 1097 (2005). There, we affirmed the admission of expert testimony on the structure of terrorist groups after "[the expert] identified his methodology as one generally employed in the social sciences"—that is, "collect[ing] as much information as possible," then balancing "each new incoming piece of information against the body of information you've built to that point." *Id.* at 337. Accordingly, the district court did not abuse its discretion when it deemed Dr. Gartenstein-Ross' explanation of his methodology, when combined with his credentials, "sufficient." J.A. 1126.

As to relevance, we conclude the testimony was relevant and met Rule 702's requirement that the expert's specialized knowledge "help the trier of fact . . . understand the evidence or to determine a fact in issue." Dr. Gartenstein-Ross' testimony assisted the jury by providing context for the historical backgrounds of and connection between Nazism and militant Islamism. As the "evidence in this case was complicated, touching by necessity on a wide variety of ideas, terms, people, and organizations connected to radical Islam," as well as white supremacism, the district court fairly concluded that the testimony would assist the jury in understanding evidence regarding predisposition. *United States v. Benkahla*, 530 F.3d 300, 309 (4th Cir. 2008). For these reasons, we conclude the district court did not abuse its discretion in admitting Dr. Gartenstein-Ross' testimony.

C. Ground Three: Evidentiary Rulings

16

Young argues that three of the district court's evidentiary rulings, considered individually or cumulatively, violated his due process right to a fair trial.

### 1. Admission of Weapons and Young's Comments

Young argues that the district court denied Young a fair trial when it reversed pretrial rulings excluding evidence of (1) Young's lawfully-owned weapons and (2) remarks Young had made to Khalil about attacking federal buildings. The contention by Young is that the district court violated his claimed entitlement to rely on several pretrial rulings as the settled law of the case. But "the district judge is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling," especially in light of issues that arise during a trial. *Luce v. United States*, 469 U.S. 38, 41–42 (1984). In particular, it is well within the district court's discretion to deem previously-excluded evidence admissible after the party seeking exclusion "open[s] the door." *United States v. Blake*, 571 F.3d 331, 348 (4th Cir. 2009).

Here, the district court did not abuse its discretion in later deeming certain evidence admissible. First, the district court provided notice to Young multiple times that it could change its in limine rulings depending on what occurred during trial. For example, the district court warned, "[N]ormally my rulings on a motion in limine are always with a caveat that if something changes during the course of the trial, the decision may be reversed[.]" J.A. 127–28. Second, with respect to Khalil's testimony, the district court properly admitted this evidence after Young decided to focus his entrapment defense on whether there was predisposition prior to his first contact with Khalil. At a pretrial hearing, the district court warned Young that by framing his entrapment defense

17

in this manner, some of Khalil's testimony about Young's statements might be admitted because such testimony would be probative of whether Young was already predisposed to support militant, radical ideas or whether Khalil implanted such ideas. (Specifically, the district court advised, "[I]f you start the predisposition at a later date, then some of that Khalil business might not come in." J.A. 261.) Nonetheless, Young continued to pursue this line of argument utilizing an earlier chronological starting point. As a result, the district court allowed Khalil to describe his relationship with Young, including recounting Young's statements about attacking the FBI, his ability to smuggle guns into a federal building, and the usefulness of ballistic vests if the FBI were to come to his home. Third, at that point, the district court did not abuse its discretion in deeming Young's possession of firearms and weapons admissible. Such possession was corroborative of Khalil's testimony, and therefore properly admissible because Khalil's credibility was fundamental in establishing Young's predisposition before 2010. For these reasons, we affirm the district court's admission of this evidence.

## 2. Exclusion of Young's and Agents' Comments

Young argues the district court erred by excluding purportedly exculpatory evidence demonstrating that he lacked the predisposition to support ISIL. First, the district court excluded, among other claimed exculpatory remarks, online comments Young had made from his LiveLeak[7] account denouncing ISIL because the Government had previously been barred from introducing other comments from this same account,

---

[7] LiveLeak is a video-sharing website.

18

which the district court had deemed unfairly prejudicial and cumulative. We discern no reversible error because in excluding these and similar comments, the district court acted within its discretion to determine whether introducing such comments would permit the admission of other previously-excluded evidence. *See McLaurin*, 764 F.3d at 384.

Second, the district court barred the introduction of June 2016 messages between FBI agents reflecting their frustration with the slow pace of the investigation, which Young argued went to their motives and consequently the issue of entrapment. The district court properly concluded that the agents' motives were "irrelevant" to entrapment because whether or not Young was induced had to be assessed by "what specifically was presented to [Young]" by the agents rather than what the agents discussed amongst themselves. J.A. 443. *See also United States v. Daniel*, 3 F.3d 775, 778 (4th Cir. 1993) ("Inducement . . . involves elements of governmental . . . conduct sufficiently excessive to implant a criminal design in the mind of an otherwise innocent third party."). We thus conclude the district court did not abuse its discretion in excluding these materials.

### 3. Jencks Act and *Brady* Materials

Finally, Young asserts Jencks[8] and *Brady*[9] errors. In the week prior to trial, the Government made two last-minute classified Jencks productions of communications

---

[8] "Under the Jencks Act, 18 U.S.C. § 3500(b), on a motion by the defendant, the government is required to produce any 'statement' of the witness related to the witness'[] testimony that is in the government's possession." *United States v. Savage*, 885 F.3d 212, 220 (4th Cir. 2018).

[9] *Brady v. Maryland* held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment[.]" 373 U.S. 83, 87 (1963).

amongst FBI agents about (1) the number of audio recordings made of Mo's meetings with Young and (2) their frustration with the pace of their investigation of Young. Young moved to strike the witnesses as to whom the Jencks material applied or to continue trial. Rather than striking the witnesses, the district court permitted defense counsel a five-day continuance to which Young did not object. Young now argues that the district court erred in doing so, contending these materials suggested spoliation of exculpatory evidence and therefore a *Brady* violation.

We discern no reversible error by the district court. First, when the government fails to timely provide discovery materials that are not exculpatory, such as Jencks materials, the district court's determination of whether to impose a sanction, and what sanction to impose, is reviewed for abuse of discretion. *See United States v. Sterling*, 724 F.3d 482, 512 (4th Cir. 2013). "A continuance is the preferred sanction." *Id.* In fashioning a remedy, the district court must consider the reason for the government's delay, whether the government acted intentionally or in bad faith, the degree of prejudice (if any) suffered by the defendant, and whether any less severe sanction will remedy the prejudice. *Id.* We have recognized that it is the rare case that would, absent bad faith, result in an exclusion of evidence (such as striking witnesses). *Id.* Here, the district court correctly recognized that the government did not act in bad faith, given that the vast majority of discovery was produced well in advance of trial, and that Young was not prejudiced because the materials at issue were not "relevant, let alone exculpatory." J.A. 278. Nonetheless, given the last-minute production, the district court permitted defense

20

counsel an ample continuance to review the material. Under these circumstances, the district court did not abuse its discretion.

Second, to establish a *Brady* violation, the evidence at issue must have been (1) favorable to the defendant (either because it was exculpatory or impeaching), (2) material to the defense (that is, prejudice must have ensued), and (3) suppressed (that is, within the prosecution's possession but not disclosed to defendant). *United States v. Sarihifard*, 155 F.3d 301, 309 (4th Cir. 1998). But here, no issue implicating *Brady* arose. Young contends that some of the Jencks material suggested Government spoliation of some audio recordings of Mo's meetings with Young. Specifically, he notes that FBI records indicate that Young and Mo discussed ISIL for the first time during a June 29, 2014 meeting, but that no recording of this meeting was produced to him. Young argues that because (1) most of Mo's other meetings with Young were recorded and (2) such an early conversation regarding ISIL may have been probative of Young's predisposition, the Government withheld potentially exculpatory evidence and thereby committed a *Brady* violation. But a review of the record—particularly the very FBI communications at issue—indicates that a recording of the meeting, unlike recordings of most of Mo's other meetings with Young, was never made and that any information purportedly within the recordings was not material.[10] There is no record evidence to the contrary. Given this,

---

[10] Evidence is material if there is a reasonable probability that it would have produced a different outcome. *United States v. Kelly*, 35 F.3d 929, 936 (4th Cir. 1994). Young suggests the purported missing conversation would have gone to Young's lack of predisposition because it could have included statements by Young criticizing ISIL or supporters of ISIL. However, by Young's own count, at least thirteen similar comments (Continued)

21

Young has offered nothing but rank speculation as to the nature of the allegedly suppressed materials, which cannot establish a *Brady* violation. *See United States v. Stokes*, 261 F.3d 496, 502 (4th Cir. 2001) (noting that to prove a *Brady* violation, the defendant must show that "the prosecution had the [purportedly withheld materials] and failed to disclose them"); *see also United States v. Caro*, 597 F.3d 608, 619 (4th Cir. 2010) ("Because [the defendant] can only speculate as to what the requested information might reveal, he cannot satisfy *Brady*'s requirement of showing that the requested evidence would be favorable to the accused."). We therefore affirm the district court's ruling on this issue.

### III. Ground Four: Obstruction Convictions

Young argues that the Government failed to provide sufficient evidence to prove the attempted obstruction of justice counts and that the district court erroneously denied his motion for judgment of acquittal after a guilty verdict. Fed. R. Crim. P. 29(c). We review the denial of such a Rule 29 motion de novo. *United States v. Howard*, 773 F.3d 519, 525 (4th Cir. 2014). "In its assessment of a challenge to the sufficiency of evidence, a reviewing court views the evidence in the light most favorable to the prosecution and decides whether 'substantial evidence'"—that is, "evidence that a reasonable finder of

---

were admitted during Mo's testimony. Therefore, the recordings would not have been material because the jury nonetheless found—despite the admission of similar comments—that Young was predisposed to support terrorism. These reasons also support the holding that the district court did not err in declining to find a *Brady* violation.

22

fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt"—supports the verdict. *Id.* Under that standard, we conclude that the evidence was insufficient to prove the nexus and foreseeability requirements of the obstruction statute and consequently vacate the convictions under Counts Two and Four.

## A. Elements of the Offense

To convict Young of attempted obstruction, the Government was required to prove he (1) "corruptly" attempted to (2) "obstruct[], influence[], or impede[]" (3) "an official proceeding" during the December 3 and 5, 2015 interviews with FBI agents (Count Two) and when he sent the November 2014 text message (Count Four). 18 U.S.C. § 1512(c)(2).

An "official proceeding" includes a grand jury investigation, but not an FBI investigation. 18 U.S.C. § 1515(a)(1) provides that "official proceeding" encompasses: "(A) a proceeding before a judge or court of the United States . . . or a Federal grand jury" or "(C) a proceeding before a Federal Government agency which is authorized by law[.]" Here, only a proceeding before a "Federal grand jury," as found at § 1515(a)(1)(A), could apply to Young. Other circuits considering whether an FBI investigation would fall under § 1515(a)(1)(C) have concluded that it does not because the use of the preposition "before" in conjunction with "Federal Government agency" implies "some formal convocation of the agency in which parties are directed to appear, instead of any informal investigation conducted by any member of the agency." *United*

23

*States v. Ermoian*, 752 F.3d 1165, 1171 (9th Cir. 2013) (citing *United States v. Ramos*, 537 F.3d 439, 462–63 (5th Cir. 2008)). We agree with our sister circuits.

Young argues that the evidence was insufficient to prove the existence of an "official proceeding" that he could have obstructed. First, Young asserts there was no "official proceeding" concerning Mo for Young to obstruct: Mo was the FBI's own informant and therefore the FBI never investigated Mo. Second, Young contends there was no evidence that Young attempted to obstruct a proceeding concerning himself: the agents never informed Young that he was under investigation; the gift card crime was committed after the allegedly obstructive conduct, so there was no crime whose investigation Young could knowingly have attempted to obstruct; and an agent testified that Young was not aware of any investigation until his arrest in August 2016. And even if he had been aware of an FBI investigation of himself, Young asserts, such an investigation would not have constituted an "official proceeding" under § 1515(a)(1).

Young's view misses the mark but points to a much more fundamental flaw in the Government's evidence. As 18 U.S.C. § 1512(f)(1) provides, "an official proceeding need not be pending or about to be instituted at the time of the offense." Therefore, it was immaterial whether an official proceeding actually existed at the time of the obstructive conduct.[11] Nonetheless, § 1512(c) *does* require that (1) the obstructive conduct be connected to a specific official proceeding (the "nexus" requirement) that was

---

[11] Although the FBI began "request[ing] federal grand jury subpoenas related to [Young]" as early as 2011, the existence of such a grand jury investigation is irrelevant to our determination of this matter for the reasons we describe. J.A. 1376.

(2) either pending or was reasonably foreseeable to Young when he engaged in the conduct (the "reasonable foreseeability" requirement). These requirements, while not explicitly laid out in § 1512(c), arise from two Supreme Court cases—*United States v. Aguilar*, 515 U.S. 593 (1995), and *Arthur Anderson, LLP v. United States*, 544 U.S. 696 (2005)—in which the Supreme Court identified these elements from related obstruction statutes.[12] *See also Marinello v. United States*, 138 S. Ct. 1101, 1110 (2018).

*Aguilar* considered the catchall provision of a statute criminalizing attempted grand jury tampering. 515 U.S. at 599. The defendant had lied to the FBI during the course of an investigation and was convicted of "corruptly endeavoring to influence, obstruct, and impede [a] grand jury investigation" in violation of 18 U.S.C. § 1503. *Id.* All the government had shown in support of the conviction was that the defendant had uttered false statements to an investigating agent "who might or might not testify before a grand jury." *Id.* at 600. The Supreme Court held that § 1503 required a greater connection between the obstructive act and an official proceeding than what the government had shown—specifically, a "nexus" showing "that the act [had] a relationship in time, causation, or logic with the judicial proceeding." *Id.* at 599. In considering the evidence, the Court in *Aguilar* concluded: "We do not believe that uttering false statements to an investigating agent—and that seems to be all that was

---

[12] Our sister circuits have noted that "[t]he nexus limitation is best understood as an articulation of the proof of wrongful intent that will satisfy the *mens rea* requirement of 'corruptly' obstructing or endeavoring to obstruct"—that is, the first element of proving a § 1512(c)(2) charge. *United States v. Erickson*, 561 F.3d 1150, 1159 (10th Cir. 2009) (quoting *United States v. Quattrone*, 441 F.3d 153, 170 (2d Cir. 2006)).

25

proved here—who might or might not testify before a grand jury is sufficient to" satisfy the nexus requirement. *Id.* at 600.

*Arthur Andersen* applied the nexus requirement to § 1512(b)(2)(A) offenses, which criminalize "knowingly" and "corruptly persuad[ing]" another person "with intent to cause" that person to tamper with documents that would be used in an official proceeding. 544 U.S. at 703. There, the Supreme Court considered whether the government was required to prove a nexus between the tampering and a particular (rather than abstract) proceeding. *Id.* at 707–08. Although the government pointed to § 1512(f) to argue that the statute did not require contemplation of a particular proceeding, the Supreme Court concluded that an official proceeding must, at a minimum, be reasonably foreseeable to the defendant who commits the obstructive act: "It is . . . one thing to say that a proceeding need not be pending or instituted at the time of the offense, and quite another to say a proceeding need not even be foreseen." *Id.* A knowingly corrupt persuader cannot be convicted "when he does not have in contemplation any particular official proceeding in which those documents might be material." *Id.* at 708.

Though we have not specifically done so,[13] other circuits have applied *Aguilar* and *Arthur Andersen* to the similarly-structured statute, § 1512(c), to conclude that, in

---

[13] We have previously considered in an unpublished per curiam opinion a defendant's nexus argument. In affirming his § 1512(c)(2) conviction, we concluded the evidence was sufficient to uphold his conviction because "there [was] a clear, logical relationship between his [obstructive] conduct and the judicial proceeding." *United States v. Wein*, 521 F. App'x 138 (4th Cir. 2013) (per curiam). But we have not further addressed the nexus or reasonable foreseeability requirements to prove such a charge. *See id.*

26

demonstrating a § 1512(c)(2) offense, "the government must prove that such a proceeding was reasonably foreseeable to the defendant" and "that there was a 'nexus' between the defendant's conduct and the pending, or foreseeable, official proceeding." *United States v. Martinez,* 862 F.3d 223, 237 (2d Cir. 2017); *see, e.g.*, *United States v. Petruk*, 781 F.3d 438, 445 (8th Cir. 2015); *United States v. Tyler,* 732 F.3d 241, 249–50 (3d Cir. 2013) (applying the nexus and foreseeability requirements to "any prosecution brought under a § 1512 provision charging obstruction of justice involving an 'official proceeding'"); *United States v. Bennett,* 664 F.3d 997, 1013 (5th Cir. 2011) (applying the nexus requirement to § 1512(c)(2)), *vacated on other grounds by* 567 U.S. 950 (2012); *United States v. Friske,* 640 F.3d 1288, 1292 (11th Cir. 2011) (same); *United States v. Phillips,* 583 F.3d 1261, 1263–64 (10th Cir. 2009) (same); *United States v. Carson,* 560 F.3d 566, 584 (6th Cir. 2009) (assuming arguendo that the nexus requirement applies to § 1512(c)(2)). And as the Eighth Circuit noted in *Petruk*, "[W]e are aware of no circuit that has considered and rejected application of the nexus requirement to § 1512(c)(2)," given the "similarity of statutory language between § 1512(c)(2) and the catchall provision at issue in *Aguilar,* the application of the nexus requirement in *Arthur Andersen* to another provision of § 1512, and other circuits' application of the nexus requirement to § 1512(c)(2)." 781 F.3d at 445. We agree and hold that § 1512(c)(2) incorporates the nexus and reasonable foreseeability requirements set forth in *Aguilar* and *Arthur Andersen.* That is, it is a requirement "that a successful prosecution under § 1512(c)(2) [provide] proof beyond a reasonable doubt that the defendant contemplated a particular, foreseeable proceeding, and that the contemplated proceeding constituted an 'official

27

proceeding,' which is defined under § 1515(a)(1)(A) to include a proceeding before a federal judge, court, or grand jury[.]" *Id.* at 445. Young's convictions do not meet this requirement.

## B. Young's Obstruction Convictions

Upon considering the evidence presented at trial, we conclude that the evidence was insufficient to convict Young of Counts Two and Four for attempting to obstruct justice under 18 U.S.C. § 1512(c)(2). In November 2014 and December 2015, Young did design his conduct to mislead FBI agents, including those he believed were investigating his relationship with Mo. With respect to Count Four, prior to Mo's "trip," Young told Mo the FBI would investigate Young after becoming aware Mo had joined ISIL and that they knew one another. Young said he would send the text because the text would be "good for [Young]," helping Young avoid suspicion from law enforcement that he knew of Mo's plans to join ISIL. J.A. 656. And with respect to Count Two, when Young thought in December 2015 that the FBI had learned that Mo had joined ISIL, Young attempted to deceive the FBI by providing statements consistent with the cover story, disclaiming any knowledge of Mo's whereabouts or plans. Young would only have undertaken these actions had an FBI investigation—whether in November 2014 or December 2015—been at least foreseeable to him.

But this is not enough for purposes of § 1512(c)(2). In neither situation (November 2014 or December 2015) was this conduct connected to a specific official proceeding, nor was such a specific official proceeding reasonably foreseeable to Young. Simply because an FBI investigation was reasonably foreseeable to Young does not mean

28

that a grand jury investigation was reasonably foreseeable to him or that his conduct was designed to obstruct a grand jury's proceedings. Specifically as to Count Two, the evidence is insufficient largely for the same reason that it was insufficient in *Aguilar*: "All the Government ha[s] shown was that [the defendant] had uttered false statements to an investigating agent who might or might not testify before a grand jury." *Arthur Andersen*, 544 U.S. at 708. Even if there is sufficient evidence to demonstrate that Young obstructed an FBI investigation, there is simply no evidence to demonstrate he was aware either that his conduct would affect a grand jury proceeding or that a grand jury or similar proceeding was impending. And with respect to Count Four, the Government has similarly failed to provide evidence demonstrating that Young foresaw a specific grand jury investigation or that he designed his conduct to thwart such an investigation, rather than designing his conduct to obstruct an FBI inquiry—which he *did* foresee.

Rather, Young's case is more analogous to that of *Friske*, in which the Eleventh Circuit reversed a defendant's § 1512(c)(2) conviction for attempting to obstruct a forfeiture proceeding. There, the defendant had, at the behest of an incarcerated friend, gone to the latter's home to retrieve certain unspecified items which turned out to be subject to forfeiture. 640 F.3d at 1289–90. In overturning the defendant's conviction, the Eleventh Circuit concluded that the government had failed to prove that the defendant "knew that the natural and probable result of his actions would be the obstruction of [the friend's] forfeiture proceeding." *Id.* at 1292–93. Even though the defendant "was certainly acting suspiciously," "more is required to prove a violation of § 1512(c)(2)."

29

*Id.* at 1292. But because the only way for the jury to conclude that the defendant "knew of or foresaw the forfeiture proceeding" "would be through speculation," the evidence was insufficient to convict him. *Id.* at 1293. Similarly, although Young's actions were certainly designed to thwart an FBI inquiry, the only way the jury could have concluded he foresaw a particular grand jury investigation would be through speculation.

The insufficiency of the evidence here is highlighted by cases in which courts have found that a grand jury proceeding into criminal activity was reasonably foreseeable because of a defendant's actual awareness of an ongoing or impending investigation into closely related activity and specific criminal actions in relation to such awareness. *See United States v. Binday*, 804 F.3d 558, 590 (2d Cir. 2015) (finding a grand jury proceeding was foreseeable because the defendant was aware that he was the target of a separate regulatory investigation into an insurance fraud scheme and had destroyed incriminating documents related to the scheme); *United States v. Simpson*, 741 F.3d 539, 552 (5th Cir. 2014) (finding a grand jury proceeding was reasonably foreseeable to a business owner who had learned about the execution of search warrants for his company and had ordered the deletion of emails after learning of the warrants). By contrast, based on the record before us in this case, we would be stretching the foreseeability requirement beyond its limits in concluding that Young's anticipation of an FBI investigation into an acquaintance's future trip would also reasonably herald a grand jury proceeding. To do so would be pure speculation.

Nonetheless, in an effort to bolster the evidence presented, the Government points to Young's (1) awareness of his acquaintances' arrests; (2) status as a law enforcement

30

officer; and (3) heightened suspicion of FBI surveillance of him, contending that these three factors should support the inference that a grand jury investigation was reasonably foreseeable to him and that he designed his conduct to obstruct such an investigation. But this case is entirely distinguishable from those in which a court has inferred the nexus and foreseeability requirements from similar factors. For example, in *Martinez*, the Second Circuit affirmed a § 1512(c)(2) conviction of a defendant police officer who was part of a conspiracy in which at least two dozen co-conspirators committed more than 200 robberies of drug traffickers. In upholding the sufficiency of the evidence, the Second Circuit concluded that "it was easily inferable that the 2008 arrests of many of his coconspirators made it foreseeable to [the defendant]—who estimated that as an NYPD officer, he had testified 15-20 times in grand jury proceedings . . . —that there would be a grand jury proceeding leading to numerous indictments." 862 F.3d at 238. Furthermore, "it could easily be inferred that [the defendant's] persistent searches of NYPD databases, and his reports back to coconspirators who had not been arrested, were intended to make it possible for them to avoid arrest by absconding before any outstanding warrants could be executed, thereby potentially interfering with an ongoing grand jury proceeding." *Id.*

By contrast, the indictment of Young's acquaintances was too attenuated from Young's relationship with Mo to have made a grand jury investigation of Young, Mo, or their relationship foreseeable to Young. And neither Young nor Mo was involved in an ongoing criminal conspiracy with those acquaintances. Furthermore, although Young worked in law enforcement, the Government's evidence failed to establish that he was routinely involved in grand jury proceedings—or, for that matter, had ever testified in

31

such a proceeding. And finally, Young's awareness about FBI surveillance was also inadequate to create a sufficient nexus. Although the Government established at trial that Young was constantly aware of the fact that the FBI *could* be investigating him, the Government failed to connect this general awareness—whether in combination with any of the issues discussed above or individually—with a *specific* and *reasonably foreseeable* official proceeding.

Thus, "based on our review of the record, we have uncovered no evidence to satisfy *Arthur Andersen*'s requirement that the Government prove a nexus between [the obstructive] conduct and a foreseeable particular federal proceeding to establish a conviction under" § 1512(c). *Tyler*, 732 F.3d at 250–51. Because the evidence was insufficient to meet this essential requirement, we vacate Young's convictions as to Counts Two and Four.

IV.

For the foregoing reasons, we affirm Young's conviction as to Count One, vacate Young's convictions as to Counts Two and Four, and remand for resentencing.[14]

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED*

---

[14] Because Counts One, Two, and Four were grouped under United States Sentencing Guidelines § 3D1.2(c) for sentencing purposes, we do not address Young's challenges to his sentence which, if relevant, can be addressed by the district court in the first instance upon remand.