**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 24-4313

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

MARIAN HUDAK,

Defendant – Appellant.

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  William L. Osteen, Jr., District Judge.  (1:23−cr−00231−WO−1)

Argued:  September 12, 2025                    Decided:  October 7, 2025

Before DIAZ, Chief Judge, and WILKINSON and WYNN, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Chief Judge Diaz and Judge Wynn joined.

**ARGUED:** Eugene Ernest Lester, III, LESTER LAW, Greensboro, North Carolina, for Appellant.  Brant S. Levine, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Kristen Clarke, Assistant Attorney General, Elizabeth Parr Hecker, Matthew N. Drecun, Appellate Section, Civil Rights Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Sandra J. Hairston, United States Attorney, Joanna G. McFadden, Assistant United States Attorney, Ashley E. Waid, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.

WILKINSON, Circuit Judge:

In Marian Hudak's federal hate crimes trial, the central question was whether he assaulted his victims "because of" their race. The jury found that he did. It is not hard to see why: Hudak kept a number of Nazi and Ku Klux Klan objects in his home and yelled racial epithets at his victims while he attacked them.

On appeal, Hudak argues that the jury should have considered evidence of his mental illness and should *not* have considered evidence of his Nazi memorabilia. We reject both arguments whole cloth. Hudak was given a fair trial. Now, he must accept the punishment for his racially motivated assaults.

I.

Hudak's first victim, J.D., was a Mexican-American man who lived next door to him. Hudak had a history of hostile encounters with J.D. On one occasion, he used his truck to run J.D. off the road. On another, he approached J.D. in the street, rolled down his window, and yelled "f------ Mexican, go back to Mexico, go to hell." On yet another occasion, Hudak posted an image of J.D.'s house on Facebook and commented "idiots from Mexico in my neighborhood, illegal immigrants." Then, when J.D.'s nine-year-old sister walked past Hudak's house to reach the school bus on the first day of school, Hudak yelled "you need to go back to your f------ country." J.A. 374–78; 413–14.

The incident at issue here occurred on November 27, 2021. J.D. awoke that day to find that the side of his car facing Hudak's house had been egged. Later the same day, when J.D. exited his front door, Hudak appeared and shouted that J.D.'s car was "too loud," that its headlights were "too bright," and that he was "going to kick [J.D.'s] butt." He added

that J.D.'s family was "just a whole bunch of f------ Mexicans" who "should go to hell." When J.D. responded that he would defend himself if Hudak entered his property, Hudak said that he was "going to kill" J.D. and chased J.D. to the back of his car, where he punched and kicked J.D. in the ribs and the face. Repeating that he was "going to kill" J.D., he knocked J.D. to the ground and grabbed J.D.'s girlfriend by her hair. Hudak did not cease the attack until neighbors came outside. J.A. 415–30.

Hudak's second victim was a black man named J.S. On October 13, 2022, J.S. found himself sitting in traffic next to Hudak's truck, which was festooned with a Confederate flag and a variety of other flags and stickers. With his window lowered, Hudak called J.S. a "n-----," told him to "come here, boy," and yelled that he was "going to get" him. Hudak then pulled his truck in front of J.S.'s car, parked, got out, and punched J.S.'s window four or five times. Through it all, he wore black gloves and combat boots and continued to call J.S. a "n-----." J.A. 238–41.

When J.S. sped away, Hudak chased him. As they reached J.S.'s apartment complex, Hudak blocked the entrance with his truck and got out again, yelling that he "kn[ew] where [J.S.] live[d]," that he "ha[d] pictures," that he would "be back," and that he was "going to shoot" J.S. Hudak also yelled that he would "shoot that b----," referring to J.S.'s girlfriend, who had come outside. Eventually, after J.S. and his girlfriend called the police, Hudak drove away. J.A. 250–58.

## II.

Hudak was charged with two federal hate crimes. For his assault of J.D., Hudak was charged under 42 U.S.C. § 3631(a) with "willfully injur[ing], intimidat[ing] and

3

interfer[ing] with J.D., and attempt[ing] to injure, intimidate and interfere with J.D., because of J.D.'s race and national origin, and because J.D. was occupying a dwelling." For his assault of J.S., Hudak was charged under 18 U.S.C. § 245(b)(2) with "by force and threat of force, willfully intimidat[ing] and interfer[ing] with[] J.S., and attempt[ing] to intimidate and interfere with J.S., because of J.S.'s race and color, and because J.S. was enjoying" a public roadway.

At trial, Hudak conceded that he had the specific intent to injure, intimidate, and interfere with J.D. and to intimidate and interfere with J.S. But he contested that he had assaulted either man "because of" the victim's race, color, or national origin. Instead, he argued, the two incidents were the product of generalized road rage.

The government introduced a litany of items recovered from Hudak's truck and house that shed light on the motive for his attacks. They included a Confederate flag, a KKK flag, two Nazi flags, a swastika patch, a ring bearing the Iron Cross, and a comic book with racist caricatures of black and Hispanic people. The government also presented the testimony of other people in town who had been on the receiving end of Hudak's racial epithets. One woman testified that Hudak blasted "black[s] and Mexicans, you need to go back to your country" using a speaker system attached to his truck. Another testified that Hudak yelled "f--- you, n-----" when she was next to him at stoplight. J.A. 312–18.

The jury was persuaded by the government's case, returning convictions on both counts. The court then sentenced Hudak to 41 months in prison.

4

III.

In this appeal, Hudak challenges two of the district court's evidentiary rulings: one excluding evidence of his mental illness and the other admitting evidence of his Nazi memorabilia. We review both for abuse of discretion. *United States v. Caldwell*, 7 F.4th 191, 204 (4th Cir. 2021). A district court abuses its discretion "if its decision is guided by erroneous legal principles or rests upon a clearly erroneous factual finding." *Id.*

A.

We address the court's handling of mental health evidence first. This evidence primarily took the form of an expert report by Dawn Graney, a psychologist. Hudak also attempted to offer his own testimony on the subject.

The expert report was based on two meetings in September 2023 at which Graney "assess[ed] [Hudak's] competency to stand trial." As a result, the report contained little information about Hudak's mental health at the time of his offenses—November 2021 and October 2022. What information it did contain about those periods did not paint a clear picture. According to the report, Hudak got into "political conflicts" with his neighbors in June 2021; separated from his wife in December 2021; and experienced a "worsening of some OCD symptoms (e.g., fear of contamination and excessive hand washing)" in March 2022. By April 2022, however, Hudak "seemed to be doing somewhat better overall." The report's discussion of Hudak's offense conduct was vaguer still: "[Hudak and his victims] insulted and threatened each other." J.A. 128–32.

The report concluded that Hudak was competent to stand trial. But, in the expert disclosure provided by Hudak's counsel, Graney stated the following opinion: "[Between

5

April 2021 and October 2022], [Hudak] suffered from serious mental health issues including depressive, anxiety, obsessive-compulsive, and psychotic symptoms." "It is more likely than not to a reasonable degree of medical certainty," the disclosure continued, "that he would not have engaged in the alleged conduct but for the[se] serious mental health issues." J.A. 129–30.

When Hudak took the stand, his counsel asked him whether he had "suffered from mental illness," "been treated for mental illness," or had "symptoms . . . related to mental illness." The court sustained objections from the government, so Hudak did not answer. J.A. 514–16.

On a motion in limine, the district court excluded Graney's expert testimony. It rested its decision primarily on Federal Rule of Evidence 702, which permits expert testimony only when the testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). In other words, the testimony must be both "relevant" and "reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). The court held that Graney's testimony failed to meet this standard because her report contained "no factual basis" for her opinion that Hudak's mental health was impaired at the time of his offense conduct. Moreover, her framing of Hudak's violent conduct as mere "insult[s] and threat[s]" was "woefully incomplete." J.A. 123–34.

The district court did not abuse its discretion in excluding Graney's expert testimony under Rule 702. It is axiomatic that a court may exclude an expert opinion when "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Here there was a striking incongruence between

6

Graney's expert disclosure, which surmised that mental illness was a cause of Hudak's offense conduct, and her report, which included almost no facts about the period of time in which the conduct occurred. It was reasonable for the court to conclude that this analytical gap made Graney's opinion unreliable.

The district court alternatively rested its decision to exclude Hudak's mental health evidence on the Insanity Defense Reform Act (IDRA), which provides that "[m]ental disease or defect does not . . . constitute a defense" to a federal crime unless the defendant pleads insanity. 18 U.S.C. § 17(a). Since Hudak did not plead insanity, the court held, he could not present evidence that mental illness caused him to assault J.D. and J.S.—either in the form of Graney's report or his own testimony.

The district court did not abuse its discretion in excluding this evidence under the IDRA, either. The plain language of the statute "bars a defendant who is not pursuing an insanity defense from offering evidence of his lack of volitional control as an alternative defense." *United States v. Worrell*, 313 F.3d 867, 875 (4th Cir. 2002). It is true that we have suggested the IDRA permits an exception when mental health evidence is "presented to negate the specific intent element of a specific intent crime," rather than to establish lack of volitional control generally. *Id.* at 874. But the exception applies only in "rare" cases, *id.*, and this is not one of them.

The example we gave in *Worrell* of a case that might meet the exception involved a man charged with threatening to shoot a police officer. *Id.* at 873 (discussing *United States v. Staggs*, 553 F.2d 1073 (7th Cir. 1977)). The man denied making the threat and sought to offer evidence that he had a mental condition that rendered it "highly unlikely" he would

7

have made the threat. *Id.* Such evidence would potentially be permissible under the IDRA, we observed, because it was offered "to show he did not do it, not that he could not help it." *Id.* at 874. Hudak's argument that his mental illness "contributed to his poor behavior regulation," Opening Br. at 7, by contrast, is an argument that he could not help it, not that he did not do it. It is therefore precisely the kind of "diminished capacity evidence . . . in disguise" barred by the IDRA. *Worrell*, 313 F.3d at 873.

Setting aside Rule 702 and the IDRA, Hudak's attempt to introduce mental health evidence suffered from a more fundamental problem: his mental health was not particularly relevant to the factual question facing the jury. The jury was asked to decide whether Hudak assaulted his victims "because of" their race, color, and national origin. That question is most often answered by evidence (or a lack of evidence) of racial animus, not evidence of mental illness.

The "ordinary meaning" of the phrase "because of" is "by reason of" or "on account of." *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020). Guided by this insight, the Supreme Court has interpreted the words "because" and "because of" across a range of statutes to incorporate the traditional but-for causation standard. *See id.* (Title VII's antidiscrimination provision); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013) (Title VII's antiretaliation provision); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176–77 (2009) (Age Discrimination in Employment Act); *see also Burrage v. United States*, 571 U.S. 204, 210–16 (2014) (applying the same logic to the words "results from" in the Controlled Substances Act and analogizing them to "because of"). We see no reason to treat the statutes here differently. Where the government alleges that a defendant

8

committed assaults "because of" the victim's protected characteristics under 42 U.S.C. § 3631(a) and 18 U.S.C. § 245(b)(2), the government must show only that the protected characteristics were a but-for cause of the assaults. *Accord United States v. Porter*, 928 F.3d 947, 956 (10th Cir. 2019); *United States v. Miller*, 767 F.3d 585, 594 (6th Cir. 2014).

This standard recognizes that events often have "multiple but-for causes." *Bostock*, 590 U.S. at 656. A criminal defendant may violently attack his neighbor *both* because of the neighbor's race *and* because the defendant suffers from a mental illness that makes it challenging for him to control his behavior. Indeed, the very act of violently attacking one's neighbor suggests that the defendant is not mentally sound. In most cases short of insanity, then, mental health evidence is besides the point. As long as the defendant would not have attacked his neighbor if the neighbor were a different race, the defendant has committed the attack "because of" race within the meaning of § 3631(a) and § 245(b)(2).

Any other approach would allow mental health defenses to swallow the hate crimes laws. Congress enacted these statutes in the 1960s "against a background of racial violence." *Johnson v. Mississippi*, 421 U.S. 213, 225 (1975). Then, as now, much of the racial violence plaguing our country was committed by mentally disturbed people. Congress intended the hate crimes laws to "deter and punish" anyone "who would forcibly suppress the free exercise of civil rights" of others. *Id.* at 224. The hate crimes laws are thus aimed squarely at people like Hudak.

Because the district court's decision to exclude Hudak's mental health evidence was a permissible exercise of its discretion whether considered under Rule 702 or the IDRA, we affirm.[*]

B.

We next address the court's handling of Hudak's Nazi memorabilia. The relevant evidence included two Nazi flags, a swastika patch, and a ring bearing the Iron Cross, all of which was recovered from Hudak's home, plus the testimony of a state probation officer who saw a Nazi flag draped over Hudak's bedroom door.

In a pretrial ruling, the court initially excluded this evidence under Rule 403. Nazi memorabilia was likely to be "more associated in a lay juror's mind with antisemitism" than with prejudice against "blacks and Mexicans," the court found, so its probative value was substantially outweighed by a danger of unfair prejudice. The court noted that Hudak should not be "convicted just for being a bad -- an antisemitic person." The court made clear, however, that its ruling was "preliminary" and that Hudak's Nazi memorabilia could become "fair game" depending on the defenses Hudak chose to present at trial. J.A. 156–69, 205–06.

When Hudak took the stand, he referred on direct examination to owning "Nazi flags." He added that he enjoyed collecting Confederate and other historical flags because

---

[*] Hudak also argues that the district court should have admitted his mental health evidence under Federal Rule of Evidence 404(b). This argument is both frivolous and forfeited because it was not raised below. *See Richardson v. Clarke*, 52 F.4th 614, 625 (4th Cir. 2022).

he was a "collector"; because he "support[s] [the] military"; and "because of the history of war . . . not any racisms, not any hate." In light of this testimony, the court reversed its preliminary ruling as to the admissibility of the Nazi memorabilia, reasoning that Hudak had "opened the door" to it by casting himself as a "military collector." The memorabilia, the court suggested, now had greater probative value. J.A 519–20, 540–42, 592–93.

The district court's change of heart was not an abuse of discretion. "Parties take risks in making arguments squarely rebuttable" using evidence they would prefer not be admitted. *United States v. Birchette*, 908 F.3d 50, 61 (4th Cir. 2018). "Strategic risks are just that—risks, and risks that can yield rewards may also carry consequences." *Id.* In this instance, Hudak was on notice that there might be consequences if he presented a defense that placed his Nazi memorabilia at issue. Yet he chose to do so anyways by framing himself as a military collector.

There is a difference between someone who is legitimately interested in the military history of the Civil War and World War II and someone who is motivated by the dehumanizing ideologies that those wars defeated. It is the jury's job to determine which is which. The Nazi swastika is, like the burning of a cross, a universal "symbol of hate" that can carry a range of insidious meanings. *Virginia v. Black*, 538 U.S. 343, 357 (2003); *see also United States v. Young*, 916 F.3d 368, 378–79 (4th Cir. 2019) (affirming admission of Nazi memorabilia to show "predisposition to support terrorist activity").

But Hudak points out that it was not "unlawful" for him to possess Nazi memorabilia. Opening Br. at 10. He is, of course, correct on that much. It is "the proudest boast" of our First Amendment "that we protect the freedom to express 'the thought that

11

we hate.'" *Matal v. Tam*, 582 U.S. 218, 246 (2017) (quoting *United States v. Schwimmer*, 279 U.S. 644, 655 (1929) (Holmes, J., dissenting)). Hudak was free to possess Nazi memorabilia in his home and to otherwise peacefully express his views, no matter how odious.

This case, however, is about hate crimes, not hate speech. Violent physical assaults are "not by any stretch of the imagination expressive conduct protected by the First Amendment." *Wisconsin v. Mitchell*, 508 U.S. 476, 484 (1993). And it is well established that Congress may account for racially discriminatory motives when penalizing criminal conduct, as it did in the hate crimes laws at issue here. *See id.* at 487–88 (upholding a law that imposed enhanced penalties for crimes committed "because of" race). While Hudak was entitled to possess despicable Nazi symbols, the jury was entitled to consider that fact when deciding whether he assaulted J.D. and J.S. because of their race, color, and national origin.

How much meaning to assign the Nazi memorabilia was ultimately a question of weight, not admissibility. But we see no abuse of discretion in the district court's conclusion that Hudak "opened the door to it[]," regardless of whether it would initially have been admissible. *Birchette*, 908 F.3d at 61.

IV.

We live in a time in which racial, ethnic, and religious antagonisms are "on the march." *United States v. Sherifi*, 107 F.4th 309, 318 (4th Cir. 2024). Hudak's assaults of his fellow citizens were all too emblematic of this trend. Their harm lay not only in the injuries inflicted on two men and their property, but in the lost safety and dignity of all

12

members of the targeted groups. In Hudak's balled fists and combat boots lay a message: you are not welcome here.

In Hudak's arrest and conviction, however, we find a different message. Blackstone reminds us that "among crimes of different natures those should be most severely punished, which are the most destructive of the public safety and happiness." 4 William Blackstone, Commentaries *16. Congress acted on this principle by passing federal laws "directed at crimes of racial violence." *Johnson*, 421 U.S. at 226. And it was in service of those laws that the jurors here convicted Hudak. In doing so, they expressed the enduring judgment of the American people that crimes of hate reflect neither who we are nor ever shall be.

Hudak was given a fair trial by a fine district judge, as was his right. He also received the assistance of diligent court-appointed counsel. But when all was said and done, he was found guilty because there was a mountain of evidence that he assaulted his victims because of their race, color, and national origin. We decline to disturb that verdict.

V.

For the foregoing reasons, the judgment of the district court is affirmed.

*AFFIRMED*